## LESLIE v. COMMERCIAL NAT. BANK IN SHREVEPORT.

### No. 83.

District Court, W. D. Louisiana, Shreveport Division.

July 24, 1939.

Monroe & Lemann, of New Orleans, La., and Foster, Hall & Smith, of Shreveport, La., for plaintiff.

Lee & Lee, Cook, Cook & Egan, and Herold, Cousin & Herold, all of Shreveport, La., and J. Fair Hardin, of Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiff, as the Receiver of the Commercial National Bank *of* Shreveport, in liquidation (hereafter referred to as the

old Bank, brought this suit against the Commercial National Bank *in* Shreveport (hereafter called the new Bank) for an accounting under a contract by which the former transferred to the latter all of its assets as a Banking institution. The contract is quoted as follows:

"This agreement, made and entered into this 3rd day of December, 1932, by and between The Commercial National Bank of Shreveport, a corporation organized and existing under the laws of the United States and having its principal office in the City of Shreveport, State of Louisiana, hereinafter called Party of the First Part; and the Commercial National Bank in Shreveport, a corporation organized and existing under the laws of the United States and having its principal office in the City of Shreveport, State of Louisiana, hereinafter called Party of the Second Part:

"Witnesseth:

"Whereas, because of adverse economic conditions existing in the Shreveport community and for other reasons, these conditions being aggravated by the general adverse economic, industrial and agricultural depression; and

"Whereas, a National Bank Examiner, in the usual discharge of his official duty, has made an examination of the affairs of Party of the First Part and in the classification of its assets has disclosed a substantial amount of losses, which seriously impair the capital stock of Party of the First Part, and a substantial amount of slow and doubtful assets from which further serious losses are anticipated by him; the careful analysis and classification by the National Bank Examiner having been made in conjunction and collaboration with a committee from the Board of Directors; the members of which committee are in substantial agreement with the said examiner; and

"Whereas, the condition of the affairs of Party of the First Part thus reflected produces a crisis; and it is the matured judgment of the directors of Party of the First Part that it is very much to the interest of the depositors and other creditors, the shareholders, the Shreveport community generally and to the general banking structure that the affairs of the Party of the First Part be liquidated in an orderly manner with the assistance of Party of the Second Part, as herein provided, and in order to supplement said assets and to indemnify and make whole Party of the Second Part in the assumption of the liabilities of Party of the First Part, as hereinafter provided, Party of the First Part has executed and delivered to Party of the Second Part its certain promissory note in the sum of One Million Dollars ($1,000,000.00), of even date herewith, and due in one (1) year, with interest at six per cent (6%) per annum from date, interest payable quarterly; and

"Whereas, Party of the Second Part has agreed, under certain terms and conditions hereinafter set out, to assist in the orderly liquidation of the affairs of Party of the First Part, under a plan that will insure full protection to the depositors and other creditors of Party of the First Part and will in the greatest possible degree, consistent with its own interest, protect the interest of the shareholders and alleviate the injury, actual and potential, which would devolve on the Shreveport community and other interests set out above by the forced liquidation of the affairs of Party of the First Part;

"Now, therefore:

"I. Party of the First Part has sold and by these presents does sell, transfer, assign, convey, set-over and deliver to Party of the Second Part all of its assets of every kind including cash, checks and drafts on hand and in its vaults; balances with its correspondents and remittances in transit; overdrafts; stocks, bonds, warrants, vouchers and securities; notes and bills receivable with their respective collaterals as such; debts and evidences of debt; real estate, banking, house, furniture and fixtures; and all other property and evidences of property of whatsoever nature and wheresoever located; and the officers of Party of the First Part are authorized and instructed to make any endorsement or assignment, execute and deliver any deed or other document, and to do any other lawful thing considered necessary or desirable to make legal the transfer of assets herein provided for and to put the title to same in Party of the Second Part and, in addition thereto and in support thereof, Party of the First Part has executed its certain promissory note in the sum of One Million Dollars ($1,-000,000.00), of even date herewith, due in one year, with interest thereon at the rate of six per cent (6%) per annum from date, with interest payable quarterly, which note is the legal and binding obligation of

Party of the First Part and Party of the First Part agrees and binds itself to pay the same according to its face and tenor.

"I1. In consideration of the premises and assets herein transferred, conveyed and delivered and the One Million Dollar note above described, Party of the Second Part has assumed and by these presents does assume, become liable for and agrees to pay, all and singular, the liabilities of Party of the First Part, of whatsoever nature and description; save and except its liability to its shareholders on account of their capital investment for which Party of the Second Part assumes no liability whatsoever; and save and except, further, the One Million Dollar note above referred to, for which Party of the Second Part assumes no liability whatsoever and which Party of the First Part agrees and binds itself to pay, according to its face and tenor.

"III. Party of the First Part shall have the right and it shall be its duty to select a committee to be known as STOCKHOLDERS COMMITTEE which shall consist of three (3) members which shall select its own Chairman and otherwise perfect its own organization; and said Committee shall have power and it shall be its duty to represent the shareholders of Party of the First Part in the liquidation of the assets herein transferred and the members of said Committee shall serve without compensation. Any two (2) of the said Committee shall be authorized to act and at least two (2) members of said Committee may be members of the Board of Directors of Party of the Second Part.

"The title to the assets herein transferred shall be vested in Party of the Second Part and Party of the Second Part shall have full power and authority to collect, renew, extend, sell, trade, compromise and otherwise handle and adjust the assets herein conveyed as may seem proper and most expedient to its officers and directors and its officers and agents shall not be responsible for errors in judgment but only for fraud; but, Party of the Second Part shall not sell any parcel of real estate at less than its book value without the consent of the Stockholders Committee unless thirty (30) days' notice shall have been given the said Stockholders Committee during which period of time the said Stockholders Committee shall have the right to redeem such real estate at the price of the proposed sale; and

"Party of the Second Part shall not compromise any note or other evidence of debt or sell any personal property at less than its book value without the consent of the Stockholders Committee unless seven (7) days' notice shall have been given the said Stockholders Committee during which period of time the said Stockholders Committee shall have the right to redeem the said note or other article to be compromised or sold at the price of the proposed compromise or sale; and

"It shall be the duty of the Stockholders Committee to assist the officers of Party of the Second Part in liquidating and winding up the affairs of Party of the First Part but members of said Committee shall not have access to any of the assets herein transferred except during business hours and in the presence of a representative of Party of the Second Part or with its consent and approval.

"IV. Party of the Second Part shall, as soon as practicable after the execution hereof, divide into 'Class A', 'Class B' and 'Class C' all of the assets hereby transferred.

"(a) 'Class A' assets shall include all cash on hand and may include balances due from correspondents and such other assets as Party of the Second Part may select; and 'Class A' assets shall not be entitled to the privilege of substitution and exchange as provided below for 'Class B' and 'Class C' assets.

"(b) 'Class B' assets shall be selected in an amount which, when added to 'Class A' assets above described, shall equal the total liabilities herein assumed by Party of the Second Part, and for the purpose of this classification the One Million Dollar ($1,000,000.00) note above referred to shall be considered a 'Class B' asset; and shall be set up on the general ledger of Party of the Second Part in an account or accounts to be called 'Class B' assets; and suitable subsidiary records of 'Class B' assets shall be kept in detail.

"(c) 'Class C' assets are those now believed to have a problematical and indeterminate value, and all assets of Party of the First Part, both ledger and non-ledger, not included in 'Class A' or 'Class B' shall be considered 'Class C' assets, but the record of 'Class C' assets shall not appear on the general ledger of Party of the Second

Part but Party of the Second Part shall keep suitable subsidiary records of 'Class C' assets in detail; and all unknown assets shall be a part of 'Class C' assets.

"Party of the Second Part shall have the right and power of substitution and exchange between 'Class B' and 'Class C' assets so that if any of the assets now in 'Class B' are hereafter found to be unacceptable to Party of the Second Part then Party of the Second Part shall have the right to take from 'Class C' assets any item or items or portions thereof, or cash derived therefrom, placing the same in 'Class B' assets substituting therefor the unacceptable item or items now or at any time hereafter in 'Class B' assets and the right of substitution and exchange may be exercised at any time and from time to time, it being the intention and purpose of Party of the First Part to fully protect and indemnify Party of the Second Part for the liability herein and hereby assumed and this contract shall be liberally interpreted to that end.

"V. All cash from time to time collected or realized from the corpus or principal of 'Class C' assets and all interest and other revenue derived from 'Class B' and 'Class C' assets shall be credited to an account to be called 'Class C Assets Account', and to this account shall be charged reasonable salaries of officers and employees in collecting and administering 'Class B' and 'Class C' assets together with legal fees and other expenses properly chargeable to 'Class B' and 'Class C' assets, and to this account shall be charged interest computed on daily balances at the rate of six per cent (6%) per annum on the account or accounts carried on the general ledger and called 'Class B Assets' provided that in addition to interest and expenses as provided herein, Party of the Second Part shall charge to 'Class C' assets or 'Class C Assets Account' a reasonable fee for its services in administering 'Class B' and 'Class C' assets; but any cash at any time in 'Class C Assets Account' may, at the option of Party of the Second Part, be transferred to 'Class A' assets and a like amount of 'Class B' assets transferred to 'Class C' assets.

"VI. If and when Party of the Second Part shall have collected from all of the assets herein transferred including the One Million Dollar note as above provided, an amount sufficient to indemnify itself for the liability herein and hereby assumed, including expenses and a reasonable fee as hereinabove provided, the residue of such assets, including cash derived therefrom, if any on hand, may be reconveyed and delivered to the Stockholders Committee or may, at the request of the said Committee, be retained and liquidated for the account of the said Committee.

"VII. Party of the First Part shall transfer to Party of the Second Part all indemnity bonds of its officers and employees and all other insurance policies for the protection of Party of the Second Part as its interest may appear.

"VIII. Party of the First Part agrees and binds itself to discontinue active banking operations and to go into liquidation as soon as the provisions of this contract will permit.

"There shall be a committee of four (4) members, two (2) appointed by Party of the First Part and two (2) by Party of the Second Part, and it shall be the duty of the said committee to agree and make recommendation on the rent to be paid by Party of the Second Part for the space now or hereafter occupied by Party of the Second Part in the building of Party of the First Part on the corner of Texas and Market Streets, and other matters not embodied in this contract which may come up for adjustment from time to time; and should the said committee at any time desire to do so it may call in one or more other persons to assist them in forming a conclusion.

"In witness whereof this contract has been signed by the parties hereto, acting through their respective and duly authorized officers and attested by their respective cashiers, and the same has been signed by a majority of their respective Boards of Directors and their respective seals have been affixed hereto the day and date first above written."

Thereafter on January 10, 1933, certain amendments were made to the contract which it is unnecessary to quote for the purposes of this decision.

The petition alleges that the old Bank is "no longer indebted" to the new "in any sum whatsoever * * *, but on the contrary the defendant Bank is indebted unto the old Bank in a large sum" which the latter is entitled to recover and "to have declared the contract dated, December 3, 1932, at an end."

Among the items alleged to have been wrongfully charged against the old Bank by the new, were the sums paid with interest thereon for taxes upon real estate, the record title to which had been transferred to the latter, pursuant to the contract of December 3, 1932. It is alleged in substance that the new Bank used the assessed value of this real estate, under the provisions of the State law, to reduce the taxes which it would have otherwise had to pay for the stockholders upon their shares of stock; that being a trustee or fiduciary under the above quoted contract as to the old Bank and its stockholders, the new could not thus advantage or enrich itself or its stockholders at the expense of those of the old Bank; and that the charges thus made amounting to $194,187.35 with interest, should be disallowed.

The prayer is for an accounting and for a judgment decreeing that plaintiff should be held "no longer indebted in any sum whatsoever to the defendant Bank;" that the said contract "is at an end and ordering the defendant Bank to re-transfer to plaintiff as receiver * * * all of the remaining assets belonging to the old Bank, and for judgment for such sums as the defendant may be found to be due to the plaintiff."

Certain individual stockholders have intervened and joined the receiver in his demands.

Defendant has moved to strike from the complaint Articles 10, 11, 12, 13 and 14, relating to the taxes upon the ground, in effect, that they disclose no cause or right of action.

The State of Louisiana by Act Number 14 of the Legislature of 1917 Ex.Sess., adopted the first of four permissible methods for taxing the interest of stockholders in National Banks, provided by Sec. 548 of Title 12 of the U.S.Code, 12 U.S.C.A. § 548, by imposing a tax upon the shares of stock as against the individual shareholders, to be paid by the bank, with the right in the latter to charge to and collect the same from the stockholders. The Section of the Federal Code (12 U.S.C.A. § 548) provides as follows:

"1. (a) The imposition by any state of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause." (The exception is not pertinent to the issues of the present case and is therefore omitted.)

"2. The shares of any national banking association owned by nonresidents of any State, shall be taxed by the taxing district or by the State where the association is located and not elsewhere; and such association shall make return of such shares and pay the tax thereon as agent of such nonresident shareholders.

"3. Nothing herein shall be construed to exempt the real property of associations from taxation in any State or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed.

"4. The provisions of section 5219 of the Revised Statutes of the United States as in force prior to March 25, 1926, shall not prevent the legalizing, ratifying, or confirming by the States of any tax heretofore paid, levied, or assessed upon the shares of national banks, or the collecting thereof, to the extent that such tax would be valid under said section."

The Act of the State Legislature of 1917, Ex.Sess., as amended provides, in part, as follows:

"Section 1. Be it enacted by the General Assembly of the State of Louisiana, That the shares of stock and real estate of all banks, banking companies, firms, associations, or corporations doing a banking business in this State, chartered by the laws of this State or of the United States, be and they are hereby declared subject to taxation for all purposes in the State of Louisiana." Act No. 116 of 1922.

"Section 2. That no assessment shall hereafter be made against the capital stock, surplus, or undivided profits of any bank, banking company, firm, association, or corporation engaged in the banking business, chartered under the laws of this State, or the United States, doing business in this State, whose capital stock is represented by shares, but the shares shall be assessed to the shareholders at the domicile or location of the bank, banking company, firm, association, or corporation, who appear as such upon the books, regardless of the domicile of the shareholder and regardless of any transfer not registered or entered upon its books. It shall be the duty of the President, Vice President, Cashier, or Assistant Cashier of any such bank, banking company, firm, association, or corporation engaged in the banking business to furnish to the Louisiana Tax Commission on or before the 20th day of January of each and

every year a complete list sworn to of those who are carried on its books as shareholders. All taxes so assessed against the shares of stock shall be paid by the bank, banking company, firm, association, or corporation engaged in the banking business direct, and it shall be entitled to collect the amount thus paid from the shareholders or their transferees."

"Section 4. That the value of the said shares of stock in any bank, banking company, firm, association, or corporation engaged in the banking business shall be fixed annually by the Louisiana Tax Commission for both State and local assessment purposes, and shall not exceed the par value of said shares of stock, plus any amount in which the combined declared surplus, undivided profits and contingent reserves of any such banking institution may exceed the par value of the common capital thereof; and less the par value of any preferred stock issued by such banking institutions and actually owned by the United States of America or any agency thereof, as shown by the books of such banking institution, *and less the assessed value of the real estate owned by said bank, banking company, firm, association, or corporation, and less the assessed value of the real estate owned by any corporations, all the capital stock of which (except directors qualifying shares, if any) is owned by said bank, banking company, firm, association, or corporation, and all, or substantially all, the assets of which consist of real estate acquired for debt and/or the building or buildings in which are located the main and/or branch banking house or houses of said bank, banking company, firm, association, or corporation, and/or the land on which the same is situated and/or the furniture and fixtures located thereon and* owned in connection therewith. All State and National Banks, banking companies, firms, associations, or corporations engaged in the banking business are hereby required to furnish to the Louisiana Tax Commission on or before January 20th of each and every year, a duly authenticated statement similar to those made by them to the Comptroller of the Currency or to the State Bank Commissioner, showing their condition at the close of business on the 31st day of December of the previous year." Act No. 172 of 1938. (Italics by the writer of this opinion.)

As previously stated, the new Bank in the present case, taking advantage of this State statute and of the fact that the real estate transferred to it by the old Bank stood on the record in the name of the former, in computing the value of the shares of stock for assessment purposes, deducted the assessed value of said real estate from that which the shares would otherwise have had, based upon the elements which form the value of the stock under the State Act; so that the result was to materially reduce the amount of taxes to the shareholders which the new Bank had to pay and charge to them.

I think it is clear and conceded by both sides that the conveyance of this real estate was for the purpose of securing the new Bank and facilitating it in handling the liquidation of the indebtedness of the old, and that there was no intention of vesting an irrevocable title, but that the equitable title should remain in the latter to be re-transferred to it, if any remained after the debt to the new Bank had been satisfied. Nevertheless, the stockholders of the latter Bank reaped the benefits of this situation in the reduced taxes which the Bank paid upon the stock and had the right to collect from them. It paid the ad valorem taxes upon the real estate and charged them to the old Bank.

In this situation can the old Bank and its stockholders, represented by the receiver, complain? Undoubtedly, if, instead of executing a conveyance in form, the old Bank had given a mortgage upon this real estate, it would have had to pay these taxes, but at the same time, the new Bank and its stockholders could not have availed themselves of the assessed value to reduce their taxes. The contract between the two Banks of December 3, 1932 and the deeds to the real estate together, had the effect of what is known to the law of Louisiana as an antichresis. Pertinent Articles of the Louisiana Civil Code are as follows:

"3133. The pledge is a contract by which one debtor gives something to his creditor as a security for his debt."

"3134. There are two kinds of pledge: The pawn. The antichresis."

"3135. A thing is said to be pawned when a movable thing is given as security; and the antichresis, when the security given consists in immovables."

"3176. The antichresis shall be reduced to writing. The creditor acquires by this contract the right of reaping the fruits or other revenues of the immovables

to him given in pledge, on condition of deducting annually their proceeds from the interest, if any be due him, and afterwards from the principal of his debt."

"3177. The creditor is bound, unless the contrary be agreed on, to pay the taxes, as well as the annual charges of the property which have been given to him in pledge. He is likewise bound, under penalty of damages to provide for the keeping and useful and necessary repairs of the pledged estate, saving himself the right of levying on their fruits and revenues all the expenses respecting such charges."

██ ██ The relationship between the parties in this case falling within the purview of these articles, it was the duty of the new Bank to pay the taxes and it was justified in charging them to the old, unless the conditions brought about by the provisions of the State statute and the course pursued by the defendant thereunder, make it inequitable to do so. There can be little question but what the relation of the new Bank to the old and the administration of the property and estate intrusted to the former, was one requiring the utmost good faith and constituted it an agent, trustee or fiduciary. 2 C.J.S., Agency, § 1, page 1023, et seq., Verbo Agency, Sec. 1; Carcaba v. McNair, 5 Cir., 68 F.2d 795, Certiorari denied 292 U.S. 646, 54 S.Ct. 780, 78 L.Ed. 1497. It could not profit therefrom in any manner other than as provided by the contract, or permit anyone else to do so. 3 C.J.S., Agency, § 165, page 53, Verbo Agency, Sec. 165. If the transaction involved in this case had been between individuals, or if the stock could have been taxed directly to the Bank, and he or it had used the value of the property standing in his or its name for personal profit by having the taxes reduced, he or it would have been bound to account to the principal for such profit regardless of whether the principal had suffered injury or not. 3 C.J.S., Agency, § 165, page 54.

On the other hand, the officers and directors of the new Bank were likewise its lawful agents and through it of its stockholders. They therefore owed an equal duty to it and them. C.J. Vol. 14a, p. 97, Verbo Corporation, Sec. 53, et seq. The fact that the new Bank and its officers would be placed in a dual relationship with respect to the old and new Banks and their respective stockholders, was necessarily known to both sides, as parties to the contract, because of its very nature. In this situation what was the duty of the new Bank, when it came to deal with the subject of the taxation of the stock? Could it remain silent and allow the State taxing authorities to give its stockholders the benefit of the fact that this real estate stood in its name, through reduced assessment, or should it have informed these authorities of the true facts, and permitted the collection of the full amount of the taxes due upon the stock without deducting the value of the real estate, notwithstanding the nominal title thereto stood in the name of the new Bank? Had this information been given to the State taxing authorities, it would seem that they would have, on the basis of the full value of the stock, exacted their taxes without deducting the real estate and these taxes would have been charged to stockholders. I do not believe that the property of the old Bank could be thus used without its consent to the benefit and profit of the stockholders of the new Bank, and the latter should not be allowed to take credit for the taxes paid under the circumstances of this case.

Whether it can or will charge the sum so disallowed to the stockholders is of little importance; the effect will be the same, in that available funds for dividends or additions to the surplus will be reduced by just that much, and the interest of the stockholders who have received those benefits will be affected in proportion to their stock ownership. The fact that the Old Bank suffered no loss or will be benefited by this conclusion makes no difference. (See the authorities above cited.)

I therefore think the motion to strike should be denied.