**RAWLINGS v. COMMERCIAL NAT. BANK IN SHREVEPORT (MOORE et al., Intervenors).**

**No. 83.**

District Court, W. D. Louisiana. Shreveport Division.

Feb. 12, 1942.

Monroe & Lemann, of New Orleans, La., and Foster, Hall & Smith, of Shreveport, La., for plaintiff.

Lee & Lee, Cook, Cook & Egan and Herold, Cousin & Herold, all of Shreveport, La., for defendant.

Joseph Barksdale, of Shreveport, La., for intervenors.

DAWKINS, District Judge.

Plaintiff is the receiver of the old Commercial National Bank *of* Shreveport, while defendant is the new Commercial National Bank *in* Shreveport, and they will be referred to as the old and new banks. The demand is for an accounting under a contract dated December 3, 1932, the terms of which will be hereafter referred to. Some of the stockholders of the old bank have by intervention joined the receiver in his claim for relief.

The principal bases of the complaint are these:

1. The alleged wrongful charging to the old bank by the new of $150,000 with interest as State ad valorem taxes upon real estate transferred to the latter, which used it to save its stockholders some $194,187.35 taxes upon the stock of the new bank;

2. A charge by the new bank against the old of interest upon a note of $1,000,000 at the rate of six per cent per annum, bearing the same date as the contract;

3. Interest charged upon the assets of the old bank; and

4. Expenses of administration, fees, etc., which the plaintiff claims are unconscionable and should not be allowed under the contract.

Defendant contends that all of these charges were proper and reasonable.

The contract was quoted in full in the opinion of this court rendered on a motion to strike the claim with respect to taxes upon the real estate. See Leslie v. Commercial Nat. Bank, D.C., 28 F.Supp. 927.

The claims will be taken up in the order indicated.

■ The proof, I think, sustains the plaintiff's contention that the charge for taxes paid upon real estate should be disallowed. Defendant and its stockholders were relieved of taxes upon its capital stock in the sum of $194,187.35, and for the reason stated in the former opinion, neither it nor they can be permitted to profit at the expense of the estate for which it acted as a fiduciary or trustee beyond the stipulated benefits of the contract.

The contract itself reflects the conditions under which it was made. It recites that a National Bank Examiner had found the old bank in a precarious condition with its capital and surplus seriously impaired, which impelled the course agreed upon. As part of this arrangement, the note in question was executed and transferred to the new bank along with all other assets, except the right to assess stockholders of the old bank for the benefit of creditors under the National Bank Law, 12 U.S.C.A. §§ 62, 63.

In consideration of the transfer of assets, the new bank assumed all indebtedness of the old bank, including that to depositors, commercial accounts, etc., but excluded the claims of the old stockholders for their investments. The amount of this indebtedness thus assumed, as of December 3, 1932, according to an audit of a national bank examiner was as follows:

| | |
|---|---:|
| General Deposits | $12,124,466.49 |
| Rediscounts to the Federal Reserve Bank | 212,000.00 |
| Circulation | 1,000,000.00 |
| Special Deposits | 143,144.04 |
| Less Class A Assets Taken at Par 3,435,799.54 | |
| Balance of Liabilities Assumed | $10,043,810.99 |

The contract was signed by all the officers and directors of both banks. It gave the new bank full power and authority to "collect, renew, extend, sell, trade, compromise and otherwise handle and adjust" the assets and accounts, without responsibility for "errors in judgment, but only for fraud". The only limitations were that no real estate should be sold without notice to the old bank, and allowing it a period of thirty days in which to take or redeem the property at the price of the "proposed sale". A similar provision was made with respect to compromising or selling any note, debt or personal property, except that the notice was limited to seven days. The old bank was to be represented by its own committee of three members, who were to have access to the assets of the old bank during business hours and in the presence of a representative of the new bank. The new bank "as soon as practicable" was to divide the assets into three classes as follows:

"IV. Party of the Second Part shall, as soon as practicable after the execution hereof, divide into 'Class A', 'Class B' and

'Class C' all of the assets hereby transferred.

"(a) 'Class A' assets shall include all cash on hand and may include balances due from correspondents and such other assets as Party of the Second Part may select; and 'Class A' assets shall not be entitled to the privilege of substitution and exchange as provided below for 'Class B' and 'Class C' assets.

"(b) 'Class B' assets shall be selected in an amount which, when added to 'Class A' assets above described, shall equal the total liabilities herein assumed by Party of the Second Part, and for the purpose of this classification the One Million Dollar ($1,-000,000) note above referred to shall be considered a 'Class B' asset; and shall be set up on the general ledger of Party of the Second Part in an account or accounts to be called 'Class B' assets; and suitable subsidiary records of 'Class B' assets shall be kept in detail.

"(c) 'Class C' assets are those now believed to have a problematical and indeterminate value, and all assets of Party of the First Part, both ledger and nonledger, not included in 'Class A' or 'Class B' shall be considered 'Class C' assets, but the record of 'Class C' assets shall not appear on the general ledger of Party of the Second Part but Party of the Second Part shall keep suitable subsidiary records of 'Class C' assets in detail; and all unknown assets shall be a part of 'Class C' assets.

"Party of the Second Part shall have the right and power of substitution and exchange between 'Class B' and 'Class C' assets so that if any of the assets now in 'Class B' are hereafter found to be unacceptable to Party of the Second Part then Party of the Second Part shall have the right to take from 'Class C' assets any item or items or portions thereof, or cash derived therefrom, placing the same in 'Class B' assets substituting therefor the unacceptable item or items now or at any time hereafter in 'Class B' assets and the right of substitution and exchange may be exercised at any time and from time to time, it being the intention and purpose of Party of the First Part to fully protect and indemnify Party of the Second Part for the liability herein and hereby assumed and this contract shall be liberally interpreted to that end."

Items placed in Class A were to be final, but the new bank was given unlimited powers of exchange or substitution as to Classes B and C. All collections from the "corpus" or principal of Class C and all interest or revenue received from both Classes B and C assets were to be credited to an account to be known as "Class C Assets Account". This account was to be charged with "reasonable salaries of officers and employees (of the new bank) in collecting and administering" Class B and C assets, together with "legal fees and other expenses properly chargeable" to Classes B and C. This account was also to be charged with interest at six per cent per annum computed on "daily balances on the account or accounts carried on the general ledger and called Class B assets." It was further provided that "in addition to interest and expenses as provided herein, Party of the Second Part (new bank) shall charge to 'Class C Assets' or to 'Class C Assets Account' reasonable fees for its services in administering Class B and Class C assets * * *".

Article VI of the agreement was as follows: "If and when Party of the Second Part shall have collected from all of the assets herein transferred including the One Million Dollar note as above provided, an amount sufficient to indemnify itself for the liability herein and hereby assumed, including expenses and a reasonable fee as hereinabove provided, the residue of such assets, including cash derived therefrom, if any on hand, may be reconveyed and delivered to the Stockholders Committee or may, at the request of the said Committee, be retained and liquidated for the account of the said Committee."

Thereafter on January 10, 1933, certain amendments were made to this contract, the pertinent features of which were as follows: One member of the committee representing the old Bank was provided with office space in the new bank, was to be paid a salary of $5,000 a year and was to devote all of his time to assisting in the collection of the transferred assets. His salary was to be paid out of Class C Assets Account, and he was to have access to the files and records of both banks "at all reasonable times". A correction was also made of "Term" V of the original contract as follows:

"It is agreed that there is an error in this term in that it provides that the Party of the Second Part shall charge to 'Class C Assets' or 'Class C Assets Account' a reasonable fee for all services in administering 'Class B' and 'Class C' assets. To

correct this error it is expressly agreed that the party of the Second Part shall charge to 'Class C' assets or 'Class C Assets Account' a reasonable fee for its services in administering 'Class C' assets only; and that the cost of administering 'Class B' assets falls entirely upon the Party of the Second Part."

Another term was added reading: "It is further provided that if and when the Party of the Second Part shall have realized from the assets transferred an amount equal to the indebtedness assumed by the original contract, then such indebtedness assumed shall be paid or secured in such manner as to relieve the Party of the First Part from any liability therefor."

It would appear that the reason for making this contract was to protect the interest of everyone concerned, including creditors and stockholders, from the effects of closing and liquidating the old bank, and to provide in place thereof a means for gradual collection of its accounts through the instrumentality of a going institution. Its affairs, according to the bank examiner, were in a serious condition.

The new bank was created by some of the officers and stockholders of the old bank with assistance from outsiders. The only change in the name was the substitution of "in" for "of", and the business was continued in the same quarters with the same employees, but with some changes in the officers and directors. The good will and customers of the old bank passed to the new, along with its other assets. The capital stock was fixed at $1,000,000 and the major portion of the cash used to pay therefor was advanced by the old bank in the shape of loans to new stockholders and by the purchase by the old bank for $300,000 cash of an obligation of its subsidiary, the Commercial National Company, from an individual who also used this sum to purchase stock in the new bank. All these obligations were subsequently paid within a reasonable time and nothing was lost by the old bank thereon. The result was to furnish an additional million dollars with which to carry on the banking business of the old institution and to relieve the new bank of all responsibility for capital, surplus and undivided profits to the old stockholders.

The audit of the bank examiner heretofore referred to, discloses that the new bank set up, as of December 3, 1932, a classification of the assets of the old bank according to the terms of the contract as follows:

| "Assets | Amount | Class 'A' | Class 'B' | Class 'C' |
|---|---|---|---|---|
| 1. Due from banks | 1,973,684.18 | 1,973,684.18 | (Retained by OF Bank | |
| 2. Cash and Cash items | 390,118.22 | 390,118.22 | subject to contract) | |
| 3. U. S. Gov't Securities | 1,074,015.09 | 1,000,000.00 | 74,015.09 | |
| 4. Other bonds, stocks and securities | 1,366,989.26 | | 1,178,782.73 | 188,206.53 |
| 5. Federal Reserve Bank stock | 48,000.00 | | 48,000.00 | |
| 6. 5% Redemption fund | 50,000.00 | 50,000.00 | | |
| 7. Loans and discounts | 9,175,491.33 | | 7,219,143.21 | 1,956,348.12 |
| 8. Overdrafts | 1,823.05 | 1,823.05 | | |
| 9. Banking House | 773,000.00 | | 500,000.00 | 273,000.00 |
| 10. Furniture and Fixtures | 143,532.69 | | | 143,532.69 |
| 11. Other Real Estate | 432,980.54 | | | 432,980.54 |
| 12. Interest earned-not collected | 22,231.07 | | 22,231.07 | |
| 13. Customers' liability-account letters of credit | 13,500.00 | 13,500.00 | | |
| 14. Advances to trusts | 1,526.59 | | 1,526.59 | |
| 15. Deferred Interest Charges | 1,026.04 | 1,026.04 | | |
| 16. Prepaid bond and insurance premiums | 2,596.82 | 2,596.82 | | |
| 17. Prepaid interest on Time C/D's | 3,051.23 | 3,051.23 | | |
| 18. Borrowed from In Bank | 1,000,000.00 | 1,000,000.00 | 112.30 | |
| 19. Suspense items | 112.30 | | | |
| | 16,473,678.41 | 4,435,799.54 | 9,643,810.99 | 2,994,067.88" |

It will be noted that item No. 18 in this statement is shown as a loan from the new bank to the old on the note for $1,000,000 and a corresponding credit for the same amount in Class A Assets, thereby giving the old bank an additional million dollars in the items taken at par, but at the same time placing this note in the category of an unconditional interest bearing obligation of the old bank, and increasing the debts assumed by that much. It made little difference that the old bank paid interest upon the note, if its face value of $1,000,000 was credited to Class A consisting of cash and other items treated as such, which were taken at par, because it thereby reduced the amount of liabilities assumed by the new bank to that extent, and carried with it a proportionate reduction in the amount of interest to be paid. In other words, instead of paying interest at the beginning on $10,043,810.99 of obligations in Class B, it started with a sum exactly $1,000,000 less; but the old bank was bound to pay interest on this note at the same rate. This is demonstrated by the debts assumed, to-wit:

| | |
|---|---|
| Deposits | $12,124,466.49 |
| Rediscounts (Federal Reserve Bank) | 212,000.00 |
| Circulation | 1,000,000.00 |
| Special Deposits | 143,144.04 |
| Total | $13,479,610.53 |

As against this, without the note in question, the old bank was entitled to a credit of only $3,435,799.54, which left a balance of $10,043,810.99, upon which interest at six per cent had to be paid according to the contract. By cashing the note, it was reduced to $9,043,810.99.

This payment of interest was not upon assets as contended by plaintiff, but there was placed in Class B Assets a sufficient amount, when added to Class A equalled the amount of liabilities shown in the tabulation last above. These were then treated, in effect, as obligations due the new bank upon which it was to be paid interest at six per cent. Once this total amount of $13,479,610.53 was paid with interest without compounding, the old bank was entitled to have returned to it the remaining assets or to receive the surplus collected therefrom. The position of the new bank, in so far as these assets consisted of notes and accounts, was the same as that of the old bank, except that instead of taking the interest collected thereon, it credited it to the old bank and charged the latter with straight six per cent interest upon all of it. The great advantage to the new bank of this arrangement flowed from the very nature of the banking business. With a capital of $1,000,000 and proportionately good deposits, loans and other revenue producing transactions may be made amounting to several times that sum, so long as a proper reserve is kept. The new bank paid no interest on ordinary deposits to offset that charged the old bank. However, it is a matter of common knowledge that during the period covered by the performance of this contract, the banks of the county carried a major portion of their assets in cash, with other banks and in investments producing very low returns, such as Government bonds, etc., and very few realized as much as six per cent. But, at the beginning of this contract, the new bank collected that rate on approximately three-fourths of these assets. In less than nine years, it realized a profit of more than one hundred per cent upon its capital, in spite of the conditions just mentioned, mainly from the interest charged the old bank.

It should not be overlooked that the new bank and its stockholders were risking its capital of $1,000,000, as well as the liability to assessment for the benefit of creditors: but at the outside this could not exceed $2,000,000 and the income enjoyed was far in excess of normal bank earnings of that time. These considerations with others, I think, require a very liberal construction of the contract as to the old bank. It was drawn by a former national bank examiner of many years' experience, who, immediately upon its organization, became an active vice-president of the new bank. It must, therefore, be construed most strongly against the defendant. Plaintiff has not sought reformation of the agreement, but the application of such equitable considerations as the circumstances demand. Its harsh nature was partially recognized shortly after execution by the correction of errors in term V referred to earlier in this opinion. This relieved the old bank from contributing anything to the expense of administering assets in Class B and made its terms applicable solely to those in Class C. The conflict of interest which the very nature of this contract created, placed upon the new bank and its officers a very high duty

to treat the old bank fairly, and, in view of the unusually advantageous terms of the contract to the new bank, I do not believe it can be said with reason that any additional charge, above the interest collected, is justified against the small portion of the assets which were administered in Class C. The full time representative of the old bank, no doubt, rendered some service for the salary paid him in assisting the new bank to administer and collect what was due upon the assets in Classes B and C, and I believe this served to offset any claim that might reasonably be urged with respect to fees, allowances or expenses to the new bank. It does not appear that their operating force was increased or that any additional sums were spent in carrying on the business because of the collection of these Class C Assets. In normal operations, the same services would have been performed, with probable earnings far below those which were realized because of the peculiar provisions of this contract, and it seems to me equity requires that all claims of this nature be denied.

My conclusion is that the defendant should file a full and complete account of its administration of the assets of the old bank according to the rulings herein made, and within a time to be fixed after a conference between the court and the attorneys on both sides, and named in the judgment in this case.