## COMMERCIAL NAT. BANK IN SHREVEPORT v. PARSONS.

### No. 10669.

Circuit Court of Appeals, Fifth Circuit.

July 27, 1944.

Rehearing Denied Oct. 28, 1944.

See 145 F.2d 191.

Sidney L. Herold and Sidney M. Cook, both of Shreveport, La., for appellant.

Monte M. Lemann, of New Orleans, La., Pike Hall, of Shreveport, La., and J. D. Barksdale, of Ruston, La., for appellee.

Robert H. Wimberly, of Arcadia, La., for amicus curiæ.

Otis W. Bullock, of Shreveport, La., for intervener, Randle T. Moore.

Before HOLMES, McCORD, and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This is an action for an accounting under a contract that was made in Louisiana and was to be performed there. It involves a controversy between two national banks, but its correct decision upon all issues depends upon the law of Louisiana. For a statement of the case, including a verbatim quotation of the contract between the parties, see the opinions of the court below in Leslie v. Commercial National Bank, D.C., 28 F.Supp. 927, and Rawlings v. Commercial National Bank in Shreveport, D.C., 44 F.Supp. 5.

A final judgment for $509,114.49, with interest, in favor of appellee was entered on April 14, 1943, four years after suit was filed and nearly two years after the taking of oral testimony began. The new bank appealed from this judgment in its entirety.

Under the contract, the appellant assumed all of the obligations of the old bank, with two exceptions, and in consideration of such assumption the old bank transferred all of its assets to appellant to secure and indemnify it for the liabilities thus assumed. Thereupon, the old bank was immediately placed in liquidation, but it had no assets to administer except its right to the residue of the assets transferred to appellant after the latter had been paid an amount sufficient to indemnify it for the liability assumed. This should have rendered unnecessary the appointment of a receiver for the old bank.

Although the contract recited that the old bank had sold, conveyed, transferred, and delivered all of its assets of every kind to the new bank, including cash, the facts and circumstances surrounding the parties and their subsequent conduct show beyond cavil that the transaction was not a sale but a pledge.[1] Under the Louisiana law, it was a pledge of a dual nature, known as the pawn and the antichresis.[2]

---

[1] Hightower v. American National Bank, 5 Cir., 276 F. 371; Id., 263 U.S. 351, 44 S.Ct. 123, 68 L.Ed. 334.

[2] Articles 3133, 3134, 3135, 3136, and 3137 of the Louisiana Civil Code.

■■ Under the contract, the two banks sustained toward each other the relations of debtor and creditor, principal and guarantor, pledgor and pledgee, liquidator and cestui que trust; but the relation of debtor and creditor was only potential prior to the time that appellant earned fees, incurred expenses, paid some of the liabilities assumed, or lent money to the old bank, under the contract. The debts involved in this accounting arose out of the contract, and relate to fees, interest, expenses, profit on taxes, and money advanced by the new bank for the old in payment of the latter's obligations. The relation between debtor and creditor or principal and guarantor is not necessarily one of trust and confidence, but that between pledgor and pledgee or liquidator and cestui que trust is inherently one of a fiduciary character.

■ The dominant officers of the new bank were the directors of the old, and they were doubly bound to treat the latter fairly. They were in control of the liquidating corporate agent that held in pawn and antichresis not only every tangible and intangible asset of the old bank, but a million-dollar note given for the sole purpose of keeping alive the million-dollar statutory liability of its stockholders if a balance of indebtedness of the old bank remained after all of its assets were exhausted.

■ As creditor, the appellant has the right to require payment of all money due it, but must prove what sums were advanced by it. In the absence of proof, the presumption is that the debts assumed were paid by the new bank as liquidator of the old, since the obligation of the new bank as guarantor was a collateral one, essentially in the alternative, to pay the debts if the old bank's liquidator did not pay them. As pledgee, both title and possession of the res were transferred to appellant, but its position cannot be described as simply that of a trustee, because it held the res primarily for its own benefit. As liquidator, it was the appellant's duty to pay, to settle, gradually to adjust, and extinguish, all indebtedness of the old bank. The duty of absolute fidelity to the trust estate rested upon appellant, and prohibited it from creating any unnecessary conflict of interests between itself and its trust. The liquidator may not take or retain personally any fruit or revenue derived from the use of the trust property.[3]

■ It was the appellant's duty as pledgee and liquidator to pay taxes on the trust estate, and the amount so paid was properly charged to the old bank; but appellant had no right to deduct from the assessed value of its own capital stock the value of such real estate as was shown on its published statements, because it was not the owner thereof within the meaning of the statute authorizing such deductions. The credit thus obtained by the new bank was a profit derived from the trust property as effectively as if it had been paid that much in cash. This was a profit of $191,778.55, which over a series of years was obtained by appellant from the use and possession of, and record title to, trust property. It clearly does not belong to the trustee or to its stockholders. What shall be done with it in an accounting between the trustee and the cestui que trust?

■ The authorities are unanimous that appellant may not profit from the trust estate, or permit any one else to do so, in any manner other than as provided in the contract. The only sources of profit to the new bank named in the contract were reasonable fees for services rendered the old bank and a stipulated interest on daily balances of an account called Class B Assets. A saving of ad valorem taxes on its capital stock by appellant's use of the trust estate does not fall within the ambit of either fees or interest, and was not within the contemplation of the parties at the time the contract was made. It is immaterial that appellant was acting as

---

3 Articles 3168 and 3176 of the Louisiana Civil Code. The pledgee has no right to use the thing pledged for his own pleasure or benefit without the consent of the pledgor. The pledgee cannot have the enjoyment of it or receive any profit from it without the consent, express or tacit, of the pledgor. The same views are entertained by all the commentators of the French Code and expounders of the Roman Law, its source, and origin. Denis on Contracts of Pledge, Sections 205, 206. These principles seem to be of universal application. Restatement of Agency, Section 388. 49 C.J. 920, from which we quote: "The duties and relations of a pledgor and pledgee are governed more by the general maxims of equity than by the strict rules of common law. The very nature of the transaction gives rise to a trust relation between pledgor and pledgee, with its consequent duties to protect the debt or obligation and the collateral."

agent of its shareholders in assessing its capital stock and that they were, or would be, the ultimate beneficiaries. The new bank made the assessment and paid the taxes on its own capital stock as it was required by law to do; it may or may not have debited its shareholders with the taxes paid or credited them with the profit obtained; the law does not regulate bookkeeping entries of this kind. We concur in the opinion of the court below that the items in controversy should have been credited to the cestui que trust, and refer to the authorities therein cited.[4] These items should have been credited as of the respective dates on which the new bank paid the taxes on its capital stock.

[11, 12] The other points raised by appellant relate to the denial of its claims for compensation and expenses in administering Class C assets and to the award of interest to appellee. The correct decision of the issues presented upon said claims for compensation, expenses, and the award of interest to appellee, depends upon the proper construction of the contract as amended, and involves the meanings of the words fee, interest, and expenses as used in paragraphs V and VI thereof. This necessitates a determination of the legal principles that should have governed the court below in the accounting, because interest and reasonable compensation are the only sources from which appellant is entitled to retain a profit under the contract.[5] We must not confuse the words *fee, interest,* and *expenses,* as used in the contract. Each of these words has its distinct legal meaning; and the parties, by contract and conduct, have clearly evidenced their intention to distinguish between the items from these three sources. Therefore, we think the court below erred in denying appellant compensation for its services as liquidator on the ground that any additional charge above the interest collected was unjustified.[6] It may be that appellant breached its contract and is not entitled to any compensation. The liquidator may have forfeited its compensation and become liable in damages ex contractu if it violated its fiduciary duty and thereby unnecessarily caused the appointment of a receiver; but each of these claims must be determined separately on its merits, not offset roughly one against another. The exaction of excessive interest is not necessarily corrected by the denial of a reasonable fee.

Interest is the compensation allowed by law or fixed by the parties to a contract for the use or detention of money.[7] The word fee under the contract means a reward or recompense for services rendered by the bank or its officers. Expenses are allowed as an indemnification for money laid out or expended by the bank for the care, maintenance, or preservation of the trust property. No gain or profit upon expenses, except interest thereon, may be claimed by any fiduciary. Therefore, under paragraph V, appellant is entitled to no profit on salaries of its officers and employees, but only to reimbursement of a fair portion of reasonable salaries actually paid them for their services in collecting and administering Class C assets.

The stipulation for interest on daily balances of Class B assets is an anomalous one. This provision attempts to make it possible for the appellant to demand and charge interest on money borrowed from the new bank by the old at rates violative of the usury laws of Louisiana.[8] It is

---

[4] 28 F.Supp. 933.

[5] "If and when party of the second part shall have collected from all of the assets herein transferred, including the one-million-dollar note as above provided, an amount sufficient to indemnify itself for the liability herein and hereby assumed, including expenses and a reasonable fee as hereinabove provided, the residue of such assets, including cash derived therefrom, if any on hand, may be reconveyed and delivered to the stockholders' committee or may, at the request of the said committee, be retained and liquidated for the account of the said committee." Par. 6 of the contract.

[6] "The conflict of interests which the very nature of this contract created, placed upon the new bank and its officers a very high duty to treat the old bank fairly, and, in view of the unusually advantageous terms of the contract to the new bank I do not believe it can be said with reason that any additional charge, above the interest collected, is justified against the small portion of the assets which were administered in Class C." See Judge Dawkins' opinion, page 694 of the record, 44 F.Supp. pages 9, 10.

[7] Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; Commissioner v. Pan-American Life Ins. Co., 5 Cir., 111 F.2d 366.

[8] Article 2924 of the Louisiana Civil Code.

stated in the opinion of the court below that at the beginning of this contract the new bank collected interest at the rate of six per cent per annum on approximately three-fourths of assets of $9,043,810.99. This was about forty per cent per annum on the paid-in capital of the new bank, which in "less than nine years, * * * realized a profit of more than one hundred per cent upon its capital, in spite of the conditions just mentioned, mainly from the interest charged the old bank."[9]

By the contract of December 3, 1932, the appellant assumed all of the liabilities of the old bank, but it does not appear when or how it paid these liabilities. The evidence does not show that the money to pay them was credited to the account of the old bank, or even that the new bank had it available. Appellant assumed the liabilities; but, so far as appears, it did not pay them except with funds of the old bank; it merely became guarantor of them. The old bank was not released, it remained primarily liable, and of course there was no novation. On the contrary, a million-dollar note was given as additional collateral security to keep alive the stockholders' secondary liability for the very indebtedness that appellant had assumed. If the provision for interest at six per cent on Class B assets was intended to be a service charge, the amount claimed was exorbitant, and equity will not reform a contract in order to substitute an exorbitant charge for a usurious one. No reformation is asked, but the same end is sought by means of interpretation.

When the contract was made, it was contemplated by the parties that large sums of money would necessarily be advanced by appellant for account of the old bank, but no provision was made for interest to be charged on loans or advances; it was only provided in the contract that interest should be computed at the rate of six per cent per annum on daily balances of Class B assets. That all of this interest was intended as compensation for the use of money to be advanced is not only evidenced by the use of the word interest, instead of fee, commission, or compensation, but by the provision in Article V of the contract, as amended, that appellant should be allowed to charge a reasonable fee for administering Class C assets only, and that the cost of administering Class B assets should fall entirely on appellant.

The contracting parties well knew the meaning of the words employed by them; each was a banking corporation; and no one knew better than they the meaning of the word interest or the words interest on daily balances at the rate of six per cent per annum. No one knows better than bankers the difference between an interest charge and a service charge. In fixing interest charges, the parties specified the exact rate; all other charges were to be reasonable; but interest on daily balances of Class B assets was to be calculated with mathematical certainty without regard to reasonableness; and appellant even invoked the banker's customary short year of 360 days, which only applies in figuring interest charged as compensation for the use or detention of money. The original contract provided that the new bank was entitled to a reasonable fee for its services in administering Class B assets in addition to interest at the rate of six per cent per annum on daily balances of said assets. When paragraph V was amended, the ordinary meaning of the word interest was not changed but was fortified by the provision that the cost of administering Class B assets should be borne entirely by the new bank.

Usury is alleged in the pleadings of appellee; the appellant does not claim to be exempt under its charter from the operation of the usury laws of Louisiana. There is no presumption that a bank is exempt from such laws. There is no magic in banking that quells the law of usury. The usurious effect of this transaction was the same as if a man borrowed only one hundred dollars and the bank took his note for a thousand dollars and collected interest on the note at the rate of six per cent per annum. If the provision were not usurious in attempting to authorize the exaction of interest on assets, it should not be enforced in a court of equity for the following reasons:

Where the directors of a failing bank form a new bank and in effect pledge to themselves every asset of the old bank, a court of equity should scrutinize the contract with great care and strike down every oppressive and overreaching provision. This is true even though the stockholders ratified the contract, because the parties were not on an equal footing and the directors occupied a position of trust and confidence. The old shareholders were given the option to take stock in the new bank;

---

[9] See opinion of court below, 44 F.Supp. 5, 9.

but for many of them doubtless this was impossible, as very few availed themselves of the option. The contract should have been drawn so as to treat both groups fairly. The directors had the advantage of an intimate knowledge of the old bank's condition, which the ordinary stockholders did not have. A hard bargain driven by fiduciaries in such circumstances is presumed to be fraudulent and void. 25 C.J. 1118, 1119, 1120. The law of fiduciaries would be futile if it lacked the capacity to correct abuses arising out of the relation of trust and confidence existing between the directors of a corporation and its stockholders.

▮▮▮▮▮ Because Class B assets were selected so as to equal the liabilities assumed when supplemented by Class A assets, it is suggested that the intention was to allow interest on liabilities assumed rather than on assets. This construction would not help appellant. The point is that the use of the words six per cent interest on daily balances ordinarily means, and was intended by these parties to mean, a charge for the use of money, which under the law must be figured upon the amount owing by the debtor to the creditor, not upon an arbitrary amount, even though stipulated, that would result in the collection of usury. In order to avoid the usury laws, appellant may not substitute some other word for interest as used in the contract. It is estopped to say that on December 3, 1932, under the guise of a so-called interest charge, it intended to collect six per cent (aggregating $1,311,346.64) on Class B assets for services as pledgee and liquidator in addition to interest, expenses, and a reasonable fee, plus a reasonable allowance for the salaries of its officers and employees. Reference is made by appellant to the fact that the total income realized upon the old bank's assets came within $33,000 of equalling the six per cent interest charge of $1,311,346.64. Apparently the argument is that this circumstance would justify the interest charge if only it were called a fee; but this amounts to the contention that it is per se reasonable to award, as a fee for administering assets, one hundred per cent of the entire income from those assets.

This leaves no basis for the suggestion that the word fee, commission, or compensation should be substituted for the word interest in construing the contract in order to avoid the usurious effect of charging interest upon assets. If some other word had been used in the contract instead of interest, then without doubt a rate of interest on daily balances of loans and indebtedness would have been fixed in the contract. The context of the word employed, its usual and ordinary meaning, the circumstances surrounding the parties at the time, the exclusion of every other consideration,—all evidence the intention of the parties that interest on Class B assets was to be a charge for the use or detention of money. The court has no more right to substitute the word fee or premium for interest than it would have to substitute corn for wheat in a contract dealing with commodities. This brings us to the claim that part of the interest charged upon assets was compensation for assuming the obligations of the old bank.

▮▮▮▮▮ Appellant did not stipulate for and is not entitled to any fee, premium, or commission for assuming the obligations of the old bank. This was the consideration moving from appellant to the old bank for the good will of its business [10] and the pledge of every asset it possessed. This was the only consideration that the old bank and its stockholders received under the contract. Fees, interest, and expenses for the new bank were repeatedly mentioned in the contract, but these items were subordinate to the great main considerations moving the parties to its execution: the old bank obtained an absolute guarantor of its obligations;[11] the new bank obtained an established banking business with millions of deposits, and was given security for every debt it assumed. In addition, its organizers were permitted to withdraw deposits in cash from the old bank amounting to $730,000. A large part of this went into the capital stock of the new bank. Most, if not all, of the organizers of the new

[10] See Par. VII of the contract, which contains the following: "Party of the first part agrees and binds itself to discontinue active banking operations and to go into liquidation as soon as the provisions of this contract will permit."

[11] Howell v. Commissioner, 8 Cir., 69 F.2d 447; Id., 292 U.S. 654, 54 S.Ct. 864, 78 L.Ed. 1503; Peterson v. Miller Rubber Co., 8 Cir., 24 F.2d 59; 28 C.J. 895.

bank were directors of the old. Their first duty was to the old bank and its creditors.

■ We think the appellant's interpretation of the contract would not be an incentive to due diligence in liquidating bank assets. We cannot reconcile its interpretation with paragraph VI of the contract, which says that when appellant shall have collected from all of the assets transferred to it an amount sufficient to indemnify itself for the liability assumed, including expenses and a reasonable fee for its services, the residue of such assets may be reconveyed to the old bank or a committee of its stockholders. This paragraph is clear and valid; the accounting should be made in accordance with it and the other consistent provisions of the contract as amended, disregarding any conflicting provision. The appellant should be allowed a reasonable fee for administering Class C assets if the court finds that it has earned the same by faithful and efficient services to the trust estate.

■ For errors alleged by appellant in numbers three and four of its assignment of errors, we think the judgment appealed from should be set aside and a new trial granted. An entirely new account should be rendered by appellant. Useless and repetitious entries, as with reference to the million-dollar note, should be avoided. Granting that these entries were merely convenient symbols for keeping the accounts, they were very confusing. It would be more accurate to say that the note itself was merely a symbol if, as we understand, no money was advanced on it. The note was symbolic of the federal statutory liability of the stockholders. The total interest on the note charged by appellant was $308,926.29. This was a real entry; it was not symbolic. It was as real as any fact in life. If this was not usury, it was profit on a pledged asset and belonged to the pledgor. In any view it was a charge unsupported by a good or valuable consideration. The note was given to represent a potential not an existing indebtedness. The transaction was analogous to one pledging his promissory note to secure his own debt. The note was unnecessary because the contract was executed before liquidation began; and any debt for money advanced in excess of the assets would have been a

debt arising under the contract. Hightower v. Am. Nat'l Bank, supra. It would not have been necessary to rely on subrogation, a doctrine indigenous to the civil law. No service charge for keeping this note safely can be sustained in reason or custom. It was held as cumulative collateral security by the new bank for its own benefit. Since principal and interest are correlative terms, like parent and child, where no principal is owing no interest can accrue.

■ Because it did not take a crossappeal from a judgment reversed on direct appeal, the dissenting opinion would perpetuate an error against appellee committed on the original trial of this case. None of the authorities cited in the dissenting opinion supports this contention. There was but one final judgment in this case; the others were interlocutory. The appellant saw fit to appeal from the entire judgment, not from items or portions thereof as it might have done. Also, under Rule 75 (d), Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it designated the entire record, proceedings, and evidence in the court below for inclusion in the record on appeal. Why should an appellate court, remanding for retrial an action involving an intricate equitable accounting, not notice a plain error against the appellee? Courts sit to do justice between the parties, not merely to decide points in a tilt between lawyers. We are not enlarging the appellee's rights under the judgment appealed from; we are reversing and annulling the judgment at the instance of appellant.

■ An appeal in equity, unless expressly restricted, brings up both law and fact.[12] It is a proceeding in continuation of the original suit.[13] The entire cause is removed to the appellate court and tried de novo on the record and evidence in the lower court.[14] Findings of fact may not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses;[15] but there is nothing in our decision that contravenes the provisions of this rule, or of any rule, statute, or legal principle that has been called to our attention.

■ All distinctions as to forms in

---

[12] 3 Am.Jur., Sec. 814.
[13] McKenzie v. A. Engelhard & ·Sons Co., 266 U.S. 131, 142, 45 S.Ct. 68, 69 L.Ed. 205, 36 A.L.R. 416.

[14] 5 C.J.S., Appeal and Error, § 1526.
[15] Rule 52(a) of Federal Rules of Civil Procedure.

the federal courts between actions at law and suits in equity have been abolished;[16] but the difference in substance in federal judicial power between law and equity is imbedded in the Constitution and remains unaltered.[17] Therefore, a civil action against a trustee to compel an accounting for trust funds, and for profits derived from the use or misuse of trust property, falls within the established equitable jurisdiction of the federal courts, and is governed by the maxims and principles of equity.

The mere fact that filing a notice of appeal [18] has been substituted for other methods of invoking the jurisdiction of a circuit court of appeals has not obliterated pre-existing distinctions in the scope of the review between appeals and writs of error. Upon such writs, no error in law could be reviewed that did not appear upon the record or unless made a part of the record by bill of exceptions;[19] but an appeal, which was derived from the civil law, reopened the whole case, subjecting the law and the facts to a review and retrial.[20]

In the case at bar, without a cross-appeal, the appellee might have urged in support of the judgment in its behalf that usurious interest erroneously allowed appellant by the court below equalled or exceeded the amount of all items comprising said judgment. This course was approved and the additional grounds examined in United States v. American Ry. Express Co., 265 U.S. 425, page 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087, wherein the Supreme Court said: "But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it. By the claims now in question, the American does not attack, in any respect, the decree entered below. It mere-ly asserts additional grounds why the decree should be affirmed. These grounds will be examined."

The appellee did not so urge in its brief, though its plea of usury is not withdrawn but is in the record before us on this appeal, and the very items held by us to be usurious are assailed on another ground in the brief of interveners, who are the equitable owners of the remaining assets of the old bank. Therefore, the real basis of appellant's complaint must be that this court noticed an error against appellee upon a ground ignored, overlooked, or rejected by the court below and not brought up by cross-appeal. By the error under review, the interveners were not attacking the judgment in favor of appellee but were asserting an additional ground for its affirmance. We have examined the items and find them to be usurious but insufficient to prevent reversal, because of the intricacy of the accounts and the necessity of further findings. Having sought reversal of the judgment, appellant cannot complain of the action of the court on the errors assigned by it.

A comprehensive construction of the contract in suit is a prerequisite to a correct decision of the issues presented by appellant's five assignments of error. No such construction is possible without a harmonious determination on this appeal of the intention of the parties in the use of the words contained in the contract. We should not remand the cause for a new accounting in such condition that the word interest would have one meaning when examining credits to appellant and a different meaning when examining debits against it.

Appellant's fifth assignment of error assails an interest charge in favor of appellee on the ground that there is no principal due. This contention implies that interest is compensation for the use or detention of money, while under the contract appellant seeks to hold fast to the ruling that interest on assets is compensation for

---

[16] Rule 2 of Federal Rules of Civil Procedure.

[17] Article III, Sec. 2, Par. 1 of the Constitution of the United States; Courtney v. Pradt, 6 Cir., 160 F. 561, holding that the difference between causes of action at law and in equity is a matter of substance and not of form.

[18] Rule 73 of Federal Rules of Civil Procedure.

[19] Claassen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966.

[20] Elliott v. Toeppner, 187 U.S. 327, 23 S.Ct. 133, 47 L.Ed. 200; Liberty Oil Co. v. Condon Bank, 260 U.S. 235, 245, 43 S.Ct. 118, 67 L.Ed. 232; Twist v. Prairie Oil & Gas Co., 274 U.S. 684, 47 S.Ct. 755, 71 L.Ed. 1297; Richmond v. Atwood, 1 Cir., 52 F. 10, 17 L.R.A. 615; 5 C.J.S., Appeal and Error, § 1526(a) and (b).

services rendered. Its third assignment of error relates to the denial of service charges for administering Class C assets. Its fourth deals with its right to reimbursement for a pro rata share of expenses and salaries in administering Class C assets. Appellant is obtaining a reversal of the judgment on assignments three and four. Our power to reverse and remand generally on these two grounds is beyond question. Except as otherwise directed by us, this case will go back to the district court as if the former trial had not taken place.[21] It cannot be denied that the trial court may then review, reverse, or ignore its former rulings, and yet it is contended that this court may not at this time lay down the principles governing the new trial, although it may review the action of the trial court on a subsequent appeal. We do not see the necessity of such circuity of action.[22]

The judgment appealed from is reversed, and the cause remanded generally for further proceedings not inconsistent with this opinion. The costs of this appeal shall be assessed against appellant except as to one-fourth thereof, which shall be assessed against appellee.

WALLER, Circuit Judge (dissenting).

The final decree held:

1. That there was in the possession of the new bank to the credit of the receiver of the old bank the sum of $274,707.83.

2. That the receiver of the old bank was entitled to recover from the new bank the tax savings in the sum of $191,778.55, plus interest of $22,931.47, totaling $214,710.02.

3. That the receiver was entitled to recover from the new bank as a reversal of interest charges the sum of $19,696.64.

4. The receiver was entitled to recover interest at five percent on certain sums from certain dates until paid.

The appeal was by the new bank from the final judgment making the above awards.

There is before us no appeal from any previous order or decree and no cross appeal by receiver or intervenors.

The only issues involved, or that were argued orally or on brief, were:

1. Whether or not the new bank was liable to the receiver of the old bank for the savings in capital stock assessments of the new bank accruing because of the assessment of the real estate of the old bank to the new bank, the assessed value of which was deducted from the assessed value of the capital stock of the new bank.

2. Whether or not the new bank was entitled to (a) compensation and (b) pro-rata of expenses in administering "Class C" assets.

3. Whether, if the lower Court was in error in allowing the receiver for the old bank to recover the tax savings in the sum of $191,778.55, the decree of the lower Court was not erroneous in allowing recovery of interest on said sum.

In the absence of a cross appeal the foregoing three issues are all that remain in this case, and the following holdings in the majority opinion are without authority:

1. That the appointment of a receiver was unnecessary.

2. That "the liquidator may have forfeited its compensation and become liable in damages ex contractu if it violated its fiduciary duty and thereby unnecessarily caused the appointment of a receiver."

3. That the Court below erred in permitting any interest at all to be computed on accounts showing assets.

4. That it was usurious and illegal for the new bank to charge interest on assets as distinguished from money loaned.

5. That the use of the word "interest" in the contract can mean only rent for the use of money, and could not include service charges for services rendered in collecting, administering, and accounting for the assets of the old bank.

---

21 Madden Furniture Co. v. Metropolitan Life Ins. Co., 5 Cir., 127 F.2d 837; Roth v. Hyer, 5 Cir., 142 F.2d 227; Fleniken v. Great American Indemnity Co., 5 Cir., 142 F.2d 938.

22 Chittenden v. Brewster, 2 Wall. 191, 17 L.Ed. 839, from syllabus 2 of which we quote as follows: "A party not appealing from a decree cannot take advantage of an error committed against himself; as for example, that the appellant had omitted to prove certain formal facts averred in his bill, and which were prerequisite of his case. But where—assuming the fact averred, but not proved to be true—a decree given against a party in the face of such want of proof is reversed in his favor, it may be reversed with liberty given to the other side to require him to prove that same fact which the appellee, when seeking here to maintain the decree, was not allowed to object that the appellant had failed, below, to prove."

6. That the new bank is not entitled to any fee, premium, or compensation for assuming the obligations of the old bank, but that the only consideration that the new bank received under the contract was the good will of the old bank.

7. That no charge could be made for administering "Class B" assets.

8. That the new bank was only entitled to interest on monies which it actually advanced for the payment of the liabilities of the old bank.

9. That no interest or service charge should be allowed on the $1,000,000.00 note.

None of these nine matters are properly before this Court for consideration. In the absence of a cross appeal we have no jurisdiction to pass upon any questions other than those three invoked by an appeal.

In the case of Arkansas Fuel Oil Company v. Leisk, 5 Cir., 133 F.2d 79, 81, on rehearing, this Court, speaking through Judge Holmes, said:

"Pursuant to the opinion filed herein on January 4, 1943, this court modified the judgment appealed from by increasing the amount thereof in the sum of $400. Upon petition for rehearing we are reminded that the appellee did not file a cross-appeal, for which reason the amount of the judgment should not have been increased.

"In appeals in bankruptcy, this court has appellate jurisdiction to review, affirm, revise, or reverse the judgment appealed from, both as to matters of law and fact, *but the jurisdiction thus conferred must be invoked before it may be exercised.* In the absence of a cross-appeal, appellee may not attempt either to enlarge his rights under the judgment appealed from or to lessen the rights of his adversary. (Citing authorities.)" (Emphasis supplied.)[1]

The receiver not only did not cross

---

[1] The holding in this case is supported by decisions of this Court in Moller v. Herring, 5 Cir., 255 F. 670, 3 A.L.R. 624; Building & Loan Association of Dakota v. Logan, 5 Cir., 66 F. 827; Pauly Building & Manufacturing Co. v. Hemphill County, 5 Cir., 62 F. 698. It is sustained by the decisions of the Supreme Court of the United States in United States v. Black Feather, 155 U.S. 180, 15 S.Ct. 64, 39 L.Ed. 114; The Stephen Morgan, 94 U.S. 599, 24 L.Ed. 266; New Orleans Mail Company v. Flanders, 12 Wall. 130, 79 U.S. 130, 20 L.Ed. 249; Alexander, Collector of Internal Revenue v. Cosden Pipe Line Company, 290 U.S. 484, 54 S.Ct. 292, 78 L. Ed. 452, and numerous cases cited.

In Cochran et al. v. M. & M. Transport Co., 1 Cir., 110 F.2d 519, 523, it was held that in a case where the judgment grants a litigant only part of the relief sought and denies the rest, the aggrieved party may appeal or cross appeal, but that if he fails to do so he can be heard only in support of the judgment as rendered, stating: "Such judgment becomes res adjudicata as to issues decided against him."

In Morley Const. Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 192, 57 S. Ct. 325, 327, 81 L.Ed. 593, the court said: "Without a cross-appeal, an appellee may 'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S. Ct. 560, 564, 68 L.Ed. 1087. What he may not do in the absence of a cross-appeal is to 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.' Ibid. The rule is inveterate and certain. Canter v. American Insurance Co., 3 Pet. 307, 318, 7 L.Ed. 688; Chittenden v. Brewster, 2 Wall. 191, 196, 17 L.Ed. 839; The Maria Martin, 12 Wall. 31, 40, 41, 20 L.Ed. 251; Field v. Barber Asphalt Co., 194 U.S. 618, 621, 24 S.Ct. 784, 48 L.Ed. 1142; Landram v. Jordan, 203 U.S. 56, 62, 27 S.Ct. 17, 51 L.Ed. 88; Union Tool Co. v. Wilson, 259 U.S. 107, 111, 42 S.Ct. 427, 428, 66 L.Ed. 848; Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 536, 44 S. Ct. 194, 197, 68 L.Ed. 427; Langnes v. Green, 282 U.S. 531, 538, 51 S.Ct. 243, 246, 75 L.Ed. 520; Alexander v. Cosden Co., 290 U.S. 484, 487, 54 S.Ct. 292, 293, 78 L.Ed. 452. Findings may be revised at the instance of an appellant, if they are against the weight of evidence, where the case is one in equity. This does not mean that they are subject to like revision in behalf of appellees, at all events in circumstances where a revision of the findings carries with it as an incident a revision of the judgment. There is no need at this time to fix the limits of the rule more sharply. 'Where each party appeals each may assign error, but where only one party appeals the other is bound by the decree in the court below, and he

appeal, but neither in oral argument nor in his brief has he argued anything except the issues raised on the appeal of the new bank. Neither in the final decree nor in the findings of fact and conclusions of law was there any finding of usury nor any finding that the new bank was not entitled to charge interest pursuant to the contract on the $1,000,000.00 note. It did not undertake to reform, but to enforce, the contract between the parties. The observations in the majority opinion dealing with any rulings other than those assigned and discussed as error, and particularly when they were: (a) not based upon facts found by the Court below; (b) not appealed from; (c) not assigned as error; and (d) not discussed in the brief nor in oral argument, are beyond the call of duty and the power of this Court. It has no jurisdiction to pass upon these questions and any observations thereon are but empty dicta.

Were the question before us, and if the Court below had found that the six per cent interest provided for in Paragraph V of the contract had been charged against this $1,000,000.00 note in addition to the interest called for by the note, I would certainly join in the holding that no further interest or charge should be allowed on this note as a "Class B" asset of the old bank. In the first place the note was (a) conditional, (b) payable to the new bank, and (c) taken to preserve the statutory liability to stockholders for which there never developed any use nor necessity. I would not know how to escape the payment of the interest called for by the terms of the note and the contract, particularly in view of the fact that according to the stipulation of the parties (Exhibit B, R. pages 352-3) the old bank apparently was also credited with interest on this note as a "Class B" asset. Were the question before us, I would be inclined to the view that the six per cent interest or service charge on "Class B" assets, or whatever it may be called, is in reality in the nature of a rediscount, with recourse, for the handling, renewing, collecting, bookkeeping, and accounting for the assets of the old bank. At the same time the new bank was receiving $1,311,346.64 as interest, rediscount, and service charges, the old bank received $1,031,692.61, as interest. (See Exhibit B, R. pages 351-355.) The discrepancy is certainly not shocking in view of the results obtained over a nine-year period. Doubtless, the receiver for the old bank realized that the issues on the question of usury were properly determined by the lower Court and did not cross appeal. At any rate, this question is not before us.

Did I deem the question before us on appeal, I would be forced to take issue with the majority in its holding that the amendment of Paragraph V of the contract relieved the old bank from paying any charge whatsoever for the administration of "Class B" assets. This paragraph originally provided that: "* * * Party of the Second Part shall charge * * * a reasonable fee for its services in administering 'Class B' and 'Class C' assets; * * *".

The amendment provided that the "* * * Second Party shall charge to 'Class C assets' or 'Class C assets account' a reasonable fee for its services in administering 'Class C' assets only, and that the cost of administering 'Class B' assets falls entirely on the Party of the Second Part."

The foregoing provisions of the contract, as originally written and as amended, referred to "a reasonable fee", and that part of the original contract which had reference to a reasonable fee for the administering of "Class B" assets was the only part of the contract that was amended. The amendment did not change that part of the contract which provided for a charge of six per cent per annum on the "Class B" assets. In consequence, all that the amendment did was to strike out the provision that the new bank should have a reasonable fee for administering "Class B" assets, leaving the six per cent provision intact. The contract, as amended, provided that the new bank should have six per cent for administering "Class B" assets and a reasonable fee for administering "Class C" assets, and the amendment was not designed, either in words or purpose, to require the new bank to administer the "Class B" assets gratuitously.

I shall not discuss further any matters other than those raised by the appeal, because I entertain the view that none of those nine or more matters, discussed in the majority opinion, are properly before the Court. The remainder of this discussion will be devoted to issues considered as

cannot assign error in the appellate court, nor can he be heard if the proceedings in the appeal are correct, except in support of the decree from which the appeal of the other party is taken.' The Maria Martin, supra."

properly raised by the appeal, the first and foremost of which is whether or not the lower Court was in error in decreeing that the old bank was entitled to recover $191,-778.55, with interest thereon, which principal sum the new bank saved in its capital stock taxes by virtue of the fact that it held the legal title to the real estate of the old bank, although it held it only as indemnity for the liability of the old bank which it had assumed.

The new bank took the real estate and other assets of the old bank as indemnification, and the new bank was merely a pledgee or trustee of the legal title; nevertheless, in the assessment of taxes on its capital stock it deducted the value of the old bank's real estate from the book value of its own capital stock with the result that its capital stock taxes were reduced, over a period of nine years, in the total sum of $191,778.55. The lower Court found, and the majority has agreed, that this sum was in the nature of a profit or fruit derived by the new bank from the real estate of the old, and that as pledgee or as trustee the new bank should be required to account to its pledgor, the old bank, for this so-called fruit or profit from the old bank's real estate. The premise is false and consequently the conclusion is likewise. Unquestionably, if the new bank under such circumstances had received rents, crops, or fruits from the land of the old bank it would, of course, be required to account to the owner therefor, but in the present case the savings in taxes came about as a result of a *legal conclusion from an assumed fact* and not from any fruit or profit from the old bank's realty. As a result of the shrewdness of the new bank, plus the stupidity, or cupidity, of the taxing authorities, the new bank was allowed to take a deduction in its capital stock assessment to the same extent as if it had been the real owner of the old bank's real estate. The old bank's real estate did no smart thinking or acting and was not responsible for the stupidity, or cupidity, of the taxing authorities. The situation is not dissimilar from one where a person was able to establish a line of credit with a bank on the assumption that he was the owner of real estate of which he was merely the trustee of the naked legal title. If one, by virtue of the establishment of a line of credit on the foregoing assumption, uses the credit thus made available to make a business profit without in any wise using the land

or jeopardizing the title of the equitable owner, it is difficult to see by what process of reasoning such a profit could be considered a fruit or profit from the land, or that it should accrue to the real owner. In the present case the new bank did not jeopardize the title to the land of which it was the naked legal trustee. It took nothing from the land. It made no actual use of the land. The transaction left the old bank no worse off. It was injured not in the least by the transaction, but this much cannot be said for the State of Louisiana. It, and it alone, suffered, but the fact that the pledgee or trustee of the legal title evades or avoids his taxes on his own property through an erroneous assumption of fact as to an undeserved deduction does not give rise to any right in another to claim and have that which the trustee has by his shrewdness evaded and avoided in connection with his own business.

All parties seem to have proceeded on the theory that it was all right to gyp the State of Louisiana but some think it wrong to gyp the old bank.

But even if the savings were lawful, they were the result of shrewd thinking and acting on the part of the new bank, and the taking advantage of an *assumed fact* rather than taking fruit or profit from real estate. Fruits or profits from land arise out of tilling, grazing, leasing, or selling.

The old bank and the new entered into a written contract which the plaintiffs do not seek to avoid but to enforce. The parties were dealing at arm's length. It is true that the new bank was the trustee of the legal title of the old bank to its real and personal property. This required the new bank: (1) to keep the property safe; (2) to keep proper records relating to this property; (3) to account for this property at the proper time; (4) to use all reasonable diligence to collect debts due the old bank; and (5) to pay its obligations. But the new bank could not compromise any claims or sell or dispose of any of the assets of the old bank without notice to the liquidating committee of the old bank. The banks agreed on all of these things. The powers of the new bank were covered by the contract. Whatever there was of trusteeship was an incident to the relationship of debtor and creditor, obligor and obligee, or principal and guarantor. Taking possession and management of the collateral and

real property of the debtor was but an incident to the contract and the trust relationship extended only to the duty to hold the property of the old bank, collect up its debts, and pay its obligations, and thus protect itself from liability and the stockholders, of the old bank from stock assessments. These things the new bank did. The debts were paid. The stockholders of the old bank were held harmless. True it is that the new bank drove a hard bargain with the old, and that it made a profit out of the old, but the Court below found nothing wrong with this profit and no appeal was taken from his order in reference thereto. The contract contemplated that the new bank would not act gratuitously but that it should reap a profit.

The majority opinion recognizes and states that the old bank was in failing circumstances. It had lost a half million dollars in deposits in the last thirty days and in a few months prior thereto deposits had dropped several million dollars. The bank examiner had reported that its capital was impaired, and all the officers and stockholders knew this. At the time the contract was entered into the old bank was headed for destruction, and all connected with the old bank recognized that fact. Nevertheless, the majority holds that the new bank agreed to become liable for all the deposits and other obligations of the old bank for no other consideration than the good will of a failing bank and the pledge of every asset it possessed. Notwithstanding the contract provision for the payment of 6%, the majority, interpreting the contract, says: "Appellant did not stipulate for and is not entitled to any fee, premium, or commission for assuming the obligations of the old bank. This was the consideration moving from appellant to the old bank for the good will of its business and the pledge of every asset it possessed. This was the only consideration that the old bank and its stockholders received under the new contract. Fees, interest, and expenses for the new bank were repeatedly mentioned in the contract, but these items were subordinate to the great main considerations moving the parties to its execution: the old bank obtained an absolute guarantor of its obligations; the new bank obtained an established banking business with millions of deposits, and was given security for every debt it assumed."

The term "six per cent interest on 'Class B' assets" is, of course, inapt. Certainly interest is rental paid, or to be paid, for the use of money, but the contract here on its face shows that it is not interest for the use of money, but that it is in the nature of a rediscount and a banking service charge for collecting, renewal, bookkeeping, supervision, and overhead necessary to handle these assets for the old bank. The fact should also not be overlooked that the organizers of the new bank took a tremendous risk. It is a matter of common knowledge that banks were falling like leaves in Autumn at about this time, and I can find no support in the contract, in the evidence, nor in reason, for the majority view that the good will of a failing bank, with rapidly dwindling deposits, $4,000,000.00 of which were withdrawn during the first few weeks after the change, was all the consideration that was to flow to the new bank for handling these "Class B" assets over a period of nine years, during which the interest collected and paid to the old bank was within $33,000.00 of the total charges made against it in the handling of these assets.

Counsel for the appellee make no such contention in regard to the 6% charge. On page 5 of their brief is found this statement: "At the trial of the case counsel for plaintiff stated to the court that, while still of the opinion that the charges for so-called interest were grossly excessive, they could find no adequate legal basis for relief from the express provisions of the contract with respect thereto. While, as noted above, the lower court described the contract as a harsh one, it directed no change in the accounting with respect to the compensation already received by the new bank. No cross appeal has been filed."

The majority puts the lower Court in error for not doing that which counsel stated frankly they advised the lower Court there was no legal basis for doing. Again, on page 32 of the brief of counsel for the old bank, it is admitted that the contract provided for six per cent to be paid on the "Class B" assets. Counsel for the old bank say: "It is difficult to see how any contention in support of that claim could be made because (a) the contract as amended (R. 25) expressly prohibited any additional charge for the liquidation of Class B assets beyond the extremely liberal compensation already provided for through the operation of a so-called interest charge of 6% per annum on Class B assets, * * *."

Again, on page 37 of the brief of counsel for the old bank, is found this language in recognition of the right of the bank to charge the six per cent: "Under paragraph V of the agreement of December 3, 1932, the new bank was entitled to make a so-called interest charge of 6% per annum on daily balances on all Class B assets, and was also to be entitled to 'a reasonable fee for its services in administering Class B and Class C assets' (R. 18, 19). Following a meeting of the stockholders of the old bank held on January 10, 1933, these provisions of the original contract were amended so as to provide that the new bank should be entitled to charge only a reasonable fee for administering Class C assets and that the cost of administering Class B assets should fall entirely on the new bank (R. 25). This change was obviously made because it was recognized that the so-called interest charge of 6% per annum on Class B assets would constitute full compensation for all services in liquidating such assets. *While this charge was denominated in the contract as an interest charge, in effect it was a liquidation charge.*" (Emphasis added.)

Of course the old bank did not cross appeal because of the allowance by the lower Court of that which counsel for the old bank admitted was proper under the contract when they, referring to the 6% service charge, stated to the lower Court at the beginning that "they could find no legal basis for relief from the express provisions of the contract in respect thereto." It is a universal rule that the lower Court will not be put in error when the errors complained of were not seasonably called to the lower Court's attention, but here the majority is putting the lower Court in error not for alleged errors that were called to the Court's attention but for something over which all parties below were in accord, and which had the express approval of the appellee. Counsel for the appellees, being lawyers of outstanding ability and integrity, have not here urged that which the majority seeks to force them to accept, but they have with great circumspection realized that they took no cross appeal, and that, in fact, a cross appeal from a ruling made with their consent and advice would ordinarily meet only rebuke.

There are only three issues on this appeal, and they are stated on page 7 of the appellant's brief, to-wit:

"1. The claim that the defendant bank is liable for what is asserted to constitute profits growing out of the operation of the assessment of real estate of the old bank to the new bank;

"2. The denial to the new bank of charges against 'Class C' assets

(a) for services in administering them;

(b) for a prorata share of expense in administering them;

"3. The matter of interest."

Since I believe that Issue No. 1 relating to the profits out of taxes should not be resolved in favor of appellee, it necessarily follows that Issue No. 3, relating to interest on such saving, should likewise not be allowed to appellee. I think that Issue No. 2 was correctly decided by the lower Court except that the new bank was entitled, perhaps, to the nominal compensation of $1.00, or the like, for administering "Class C" assets.

(1) The new bank took all the risks of loss in assuming the liability of a failing bank. (2) The security it took was only the assets of a failing bank, the capital of which was impaired. (3) The new bank, while taking the 6% charge in the amount of $1,311,000.00, paid to the old bank interest in a sum only $33,000.00 less. (4) By virtue of the assets being administered by a going bank an actual profit was realized to the old bank, and the million dollar note which the old bank put up to balance assets with liabilities, by reason of improved business conditions and good management, was not required to be paid. Assets were made to exceed liabilities.

It is true the new bank appealed from the judgment, but it did not appeal from any judgment that held that the 6% was usury or ordered the restoration of that 6% to the plaintiff, and such question is not now before this Court. We may concede that there was an element of trust in the obligation of the old bank to the new and still the old bank would not be entitled to recover the taxes which the new bank had saved when in doing so it had in nowise invested, jeopardized, or actually used any of the assets of the old bank. Conceding that a relation of trust existed, the duty thereunder did not require the new bank to chisel the State of Louisiana out of its taxes for the benefit of the old bank.

But even if we assume, as has heretofore been assumed by all concerned, that

the arrangement for the saving on the capital stock tax of the new bank was lawful, and if we assume another fact which is not true, that the saving was the product or fruit of the land of the old bank, it would still be difficult to determine why the old bank would be entitled to *all* of the so-called profit or fruit.

The assessed value of the capital stock of the new bank and the assessed value of the real estate of the old bank, like Siamese twins, were inseparably, though artificially, bound together, even though their separate growths were in inverse ratio, since the greater the value of the assessed real estate the less would be the assessed value of the capital stock. It was the bringing of the real estate of the old bank and the capital stock of the new into juxtaposition in an assumed relationship, together with the shrewdness of the new bank, that brought about the savings. The real estate standing alone could never have had any connection, or relation, to these savings except in the identical situation where the combining of two properties into an assumed composite whole resulted in a tax saving. By a partnership of property, as it were, or an association of properties, or a compounding of elements, benefit accrued. Neither by law nor by contract is it provided that the entire benefit should go to one as against the other, nor that one might be treated inequitably or prejudicially. The Court will not project into the arrangement a result neither intended by the parties, implied by law, nor justified by equity. Whether the $191,778.55 be considered as a profit or a saving, it arose out of the conjunction of separate properties in their taxable relation to each other, and if the old bank has any right whatsoever in such savings, which I hold it did not have, it should have a right only to have the savings prorated in each of the years in the proportion that the value placed on the real estate and the value placed on the capital stock bore to the valuation that the capital stock in the new bank's return would have had had there been no deduction of the value of the old bank's real estate.

Under the contract the new bank was entitled to at least nominal compensation for administration of "Class C" assets, but in view of the large profits which it has received I am of the view that its compensation should have been only nominal.

On the record here it does not clearly appear that the lower Court was in error in refusing to allow defendants to recover a pro-rata share of the expenses in the administration of "Class C" assets.

That part of the order of the lower Court allowing the receiver to recover the tax savings of $191,778.55, together with interest in the sum of $22,931.47, should be reversed and set aside. That part of the Court's order refusing to allow compensation for the administration of "Class C" assets should be set aside and nominal compensation awarded. In all other respects the decree of the lower Court should be affirmed.