## COMMERCIAL NAT. BANK IN SHREVEPORT v. PARSONS.

### No. 10669.

Circuit Court of Appeals, Fifth Circuit.

Oct. 28, 1944.

For former opinion, see 144 F.2d 231.

Sidney L. Herold and Sidney M. Cook, both of Shreveport, La., for appellant.

Monte M. Lemann, of New Orleans, La., Pike Hall, of Shreveport, La., and J. D. Barksdale, of Ruston, La., for appellee.

Robert H. Wimberly, of Arcadia, La., for amicus curiæ.

Otis W. Bullock, of Shreveport, La., for intervener, Randle T. Moore.

Before HOLMES, McCORD, and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

From the language in appellant's brief, the writer seems to regard the reversal of this judgment as a Pyrrhic victory. Reference is made to the distinguished lawyers for appellee, and it is even stated that their knowledge of the local law is indisputable. We are willing to concede this as an abstract proposition, but it is said that even Jove himself nods at times. It may be that appellee was satisfied to let the litigation end if paid the amount of the judgment, but that is immaterial. The fact is, though no cross-appeal was taken, there was a direct appeal that transferred the entire cause to the appellate court for trial de novo on the record made in the district court, except that the trial court's findings of fact could not be set aside unless clearly

erroneous and the rights of appellee under the judgment could not be enlarged.

From the argument of counsel, no one would think that appellant sought reversal of the judgment and a retrial on the merits, but that is exactly what it did. The appellant took the appeal and asked that this case "be remanded to the lower court for a trial on the merits and adjudication as to the amount properly allowable to the defendant for administration of Class C assets and for salaries provided for in the amended contract, and for final accounting."

Appellant claims a property right in that part of this judgment from which no appeal has ever been taken, but we find no such part thereof. Not only was the entire judgment appealed from, but a supersedeas was granted by order of court, and execution was stayed pending the appeal. This was an unrestricted appeal from a final judgment. Such an appeal means the entire judgment.

The appellant seems to attribute the alleged errors in the majority opinion to the fact that no Louisiana lawyer sat in the case; but the principles applicable here are not peculiar to the civil law, and there is nothing complicated about this case except the item of profit on taxes and the pledgee's method of keeping its accounts. The asserted intricacy of the Louisiana Civil Code is the last refuge of a Louisiana lawyer with a hard case in the federal court.

Conceding, as appellant now claims, that no money was advanced to the old bank, there are only two issues left in the case: (1) The tax item, and (2) the question of compensation. It clearly appearing that the tax savings were obtained by the trustee by claiming to be the owner of trust realty, both the lower court and this court held that the profit belonged to the cestui que trust. We held that the pledgee had no right to use the pledged real estate for its own benefit, or for the benefit of any one else, without the consent of the pledgor. A contrary rule might create a conflict of interests between pledgors and pledgees or trustees and beneficiaries.

The other issues relate to fees and salaries claimed by the new bank. Under the contract, as amended, appellant was entitled to a reasonable fee for administering Class C assets. The district court denied any such allowance because of the six-per-cent interest charges against Class B assets. This made it necessary for us to look into the amount, nature, fairness, and legality of said interest charges. If it appeared that any charge against appellee was usurious, exorbitant, or without consideration, the amount thereof was relevant and material in stating the account between the parties. It was proper to consider the same in support of the judgment, but for no other purpose.

There was evidence in the record tending to support an inference that the new bank was not entitled to any compensation because of its exorbitant charges, its management of the estate so as to bring about the appointment of a receiver, and its effort to buy the trust estate at a price that would have caused great loss to the stockholders of the old bank. We did not hold, as stated in the brief of petitioner, that the appointment of the receiver was unnecessary. We did not question the necessity or validity of the appointment. We held that, under the contract, the transfer to appellant of all assets of the old bank should have rendered unnecessary the appointment of a receiver for the old bank. It is presumed that the receiver's appointment was necessary; but the question is who was to blame for the necessity of his appointment.

Whether the appellant willfully or negligently caused the appointment of this receiver was a question that emerged from the record before us, particularly from a letter to the Comptroller written by the president of the new bank less than three weeks after the receiver was appointed, in which he tried to buy the remaining assets of the old bank and recommended an assessment against its shareholders of one hundred per cent of the capital stock.[1] This was an issue that bore directly upon the allowance of compensation to the appel-

---

[1] From this letter, we quote the following (p. 470 of the record):

"The suggestion was made at the conference above referred to that the bulk sale of these assets at this time would subject all parties to criticism, because it would be claimed that the receiver could not, in so short a time, form a fair, independent opinion of the value of so large and varied an amount of notes, securities and real estate; and it is believed that a safer course, for both the receiver and the new bank, would be for the receiver to make his official appraisal and the Comptroller to levy an assessment in accordance therewith, even up to 100%; liquidate or sell

lant; but we left the issue open for determination by the district court after hearing such additional evidence as might be offered. This ruling was not a denial but was the very essence of due process of law, painstakingly afforded the appellant without even an adverse comment upon the impropriety of a trustee looking with covetous eyes upon the res in its custody.

We spent much time studying the record in an effort to ascertain what loans had been made by the new bank to the old. Over a million dollars in interest had been charged, and we naturally thought that large loans had been made; we have no doubt that large loans were contemplated. We found an additional charge of over three hundred thousand dollars for interest on a million-dollar note. Our dissenting member thought there were two such notes and that money had been advanced on only one of them, but we later found that both entries were symbolic.

In the brief for a rehearing, we are told for the first time that no loans were made to the pledgor; that it was not necessary to use a dollar of appellant's money to satisfy the obligations of the old bank, because the pledged assets were sufficient to pay all debts. This is equivalent to an admission that no interest is due by the old bank, and that all interest charges were for costs of administering Class B assets. If so, then only in paragraph V of the contract is the word *interest* to have the unusual meaning claimed by appellant. The contract in other places uses the words, *fees, interest,* and *expenses,* and when they are used elsewhere in the contract each is given its usual and ordinary meaning, interest meaning compensation for the use or detention of money. Interest is the lifeblood of a bank, and we are unable to think that these bankers did not know the usual and ordinary meaning of the word *interest* when used in the contractual phrase of *interest computed on daily balances at the rate of six per cent per annum.* To hold that they said *interest* when they meant *fee* or *commission* would not only be an unwarranted assumption, but would necessitate the presumption of an intention to mislead the stockholders of the old bank.

■ Our interpretation of interest, as meaning compensation for the use of money, is consistent with the balance of the contract; the appellant's is not. If interest was intended to mean what we have held, then the provision in the same paragraph, that the cost of administering Class B assets should fall entirely upon the appellant, is plain; but if it was intended to mean fees for administering Class B assets, it conflicts with the provision in the same paragraph that the cost of administering Class B assets shall fall entirely upon the new bank. The word costs is broad enough to include both fees and expenses of administration, but is not broad enough to include interest on money borrowed.

The modern meaning of the word usury implies that some interest was due for the use of money and that an excessive amount was charged or collected. If interest was charged by appellant for the use of money when no money was advanced or owing, then there was a total failure of consideration, and such amount should be disallowed. No interest can accrue if no principal is owing. Therefore, we would not say that the interest charged on the million-dollar note was usurious, because that would imply that some interest was due, when the fact is that there was only a potential liability on this note and not one cent of principal or interest was ever actually due or owing thereon.

■ This inexplicable note was not signed by the shareholders of the old bank. It was signed by the corporation that pledged its entire assets and agreed to quit business. As a man cannot lift himself by his own boot straps, the old bank could not increase its assets by executing a promissory note.[2] If the note had been executed

---

the assets thereafter and repay the excess, if any, to the shareholders who had paid the levy."

In conclusion, the letter states:

"If you find that you can not accept this offer, we recommend that the matter of assessment be delayed, as we believe that an assessment of any amount at this time would be unwise."

[2] The contract recites that "in order to *supplement* said assets [of the old bank] and to *indemnify* and make whole party of the second part in the assumption of the liabilities of party of the first part, as hereinafter provided, party of first part has executed and delivered to party of second part its certain promissory note in the sum of one million dollars ($1,000,000), of even date herewith, and due in one (1) year, with interest at six per cent (6%) per annum from date, interest payable quarterly." (Italics added.)

by the shareholders, or cash had been deposited by them, in consideration of their statutory liability, the old bank's assets would have been increased; but these shareholders did not execute a note or deposit any cash, although to the extent of one million dollars they were the statutory guarantors of the liabilities assumed. This note was good only to the extent that its maker was insolvent; in that event, it was merely cumulative evidence of an otherwise valid obligation. The cross-entries on appellant's books with reference to the principal of this note offset each other.

■ The note for a million dollars was not necessary to keep alive the shareholders' statutory liability, and its execution remains an enigma unless it be regarded as a unique interest-bearing device without a principal debt. This unsecured note of a fictitious entity without free assets, good will, or the right to continue in business, netted the new bank over three hundred thousand dollars in interest collected out of trust funds. Nothing has been paid or is claimed to be owing on the principal of said note, but nevertheless the new bank claims that interest accrued thereon. No such device was used, either in Richter v. Laredo National Bank, 5 Cir., 62 F.2d 289, or in Hightower v. American National Bank, 263 U.S. 351, 44 S.Ct. 123, 68 L.Ed. 334. In the Richter case, the assets of the old bank were sold and the amount of the shareholders' liability agreed upon; in the American Bank case, the assets were pledged as security for repayment of money advanced. In neither was any note given by the old bank to cover the shareholders' liability. These two cases are otherwise distinguished later in this opinion.

There is not the slightest basis for the argument that any interest-charge was intended as a fee or commission for assuming the obligations of the old bank. There was to be no charge for administering Class A or Class B assets, or for assuming the obligations of the old bank. There were to be reasonable fees and a pro rata of reasonable salaries, including expenses, for administering Class C assets; and the residue of the assets was to be turned back to the old bank when the new bank had collected an amount sufficient to indemnify itself for the liability assumed. That is all there is to this contract, and the time has come for the pledgee to "reconvey and redeliver" the "residue of such assets, includ-

ing cash", to the appellee, who is the receiver of the old bank.

Counsel is inaccurate in quoting what we said about good will. The good will of the old bank had some value, but we never held that it was the only consideration for the transfer, because the principal consideration was the pledge of every asset that the old bank possessed. Those assets, as of December 3, 1932, were classified and set up on the books of the new bank at $16,473,678.41. The deposits and other obligations of the old bank amounted to $13,479,610.53. It has been proven that the value of the pledged assets exceeded the deposits and other obligations. Therefore, we stated that appellant did not stipulate for and was not entitled to any fee, premium, or commission for assuming the obligations of the old bank; that the assumption of said obligations was the only consideration moving from appellant to the old bank for the good will of its business and the pledge of every asset it possessed. We mentioned good will as a part of the consideration merely to be accurate; it was apparent that the main consideration moving to appellant was the pledge of assets easily worth more than the amount of obligations assumed; yet, in quoting and assailing the court's ruling, the attorneys for petitioner omit any reference to the pledged assets as a part of the consideration. An item of this size should not be overlooked. According to the findings of the court below, the proceeds of the pledged assets were sufficient to pay all obligations of the old bank, all fees, interest, and expenses due to the new bank, and to leave a balance of several hundred thousand dollars due the old bank by appellant.

The petitioner states that our decision proceeds principally upon the reversal of the district court upon issues there decided upon concession of the present appellee; and consequently that the reversal was not only without a hearing so far as appellant was concerned, but without opportunity to be heard. We regret the error of counsel in stating the principal ground of reversal; the best evidence of such ground is the majority opinion. On page 12 thereof [144. F.2d 240], we said:

"For errors alleged by appellant in numbers three and four of its assignment of errors, we think the judgment appealed from should be set aside and a new trial granted." On the next page [144 F.2d 240] we said: "We are not enlarging the appellee's rights

under the judgment appealed from; we are reversing and annulling the judgment at the instance of appellant."

On page 16 [144 F.2d 242], we said:

"Appellant is obtaining a reversal of the judgment on assignments three and four."

The above excerpts indicate clearly the grounds of reversal, which were urged by appellant in its assignments of error, but observe what follows: Cognizant of its own assignments and of the recitals in our opinion, the appellant positively asserts that "the opinion is in plain error on the merits in respect of each of the items on which reversal was decreed." This is equal in effect to saying that it was plain error to reverse on items three and four of appellant's assignments of error, which is the same as saying: "The court erred in reversing on assignments three and four as requested by us." These were reasons for reversal set up in the brief, argued orally by appellant, and adopted in the opinion of the court. If it was proper to reverse on these grounds, certainly the court had a discretion as to whether it should reverse and remand generally or reverse in part and affirm in part.

If any dependence may be put in the efficacy of language to convey thought, the appellant must know that the judgment against it was reversed for errors assigned by itself. It was not reversed for errors committed by the district court against the appellee. The latter errors were examined by us, not for the purpose of enlarging the rights of appellee under the judgment, but to ascertain whether such errors were sufficient to warrant an affirmance notwithstanding the errors against appellant.

If we were wrong in examining such issues, what we said was dictum; but it was not dictum if what we said was necessary to the decision of appellant's assignments of error. We abhor dictum as much as counsel does, and try to avoid the use of it, but we have never thought of dictum as the denial of due process; that idea seems to us to be very far-fetched, coming from a litigant who has been in court five years and is about to enter upon a trial de novo.

It is said that our opinion is contrary to two prior decisions of this court, citing American National Bank v. Commercial Nat. Bank, 5 Cir., 254 F. 243; Hightower v. American Nat. Bank, 5 Cir., 276 F. 371; Id., 263 U.S. 351, 44 S.Ct. 123, 68 L.Ed. 334, and Richter v. Laredo National Bank, 5 Cir., 62 F.2d 289. We do not think so. The Hightower case is cited in Note 1 of our opinion. In that case, the liabilities exceeded the assets by more than three hundred thousand dollars; and the bank acted as liquidating agent without compensation for its own services, charging interest only on money actually loaned. In the Richter case, the liabilities exceeded the assets by one hundred and sixty thousand dollars, and the contract was for the agreed amount of the stockholders' deficiency-liability. In the case at bar, the assets exceeded the liabilities; this fact is beyond dispute. Therefore, the consideration for the one-million-dollar note utterly failed, and no interest was due thereon. To allow $308,926.29 as a service charge on this note would be a shocking injustice. We adhere to our ruling on this subject.

To recapitulate briefly: We held that savings on taxes obtained by the pledgee through use of pledged realty were a fruit of the pledge and belonged to the pledgor; that interest on assets charged against the old bank was usurious and should be disallowed; that appellant is entitled to a reasonable fee for its services in administering Class C assets if it earned the same by faithful and efficient services; that the cost of administering class B assets must fall entirely upon the new bank; that the consideration for the one-million-dollar note failed because the pledged assets of the old bank exceeded its liabilities and there was no deficiency-liability of stockholders; that after hearing such additional evidence as may be offered, the district court should make further findings as to what if any compensation should be allowed the new bank for its services and expenses in administering Class C assets; and that the judgment should be reversed and the cause remanded generally for further proceedings not inconsistent with the opinion.[3]

---

[3] Cf. Crites, Inc. v. Prudential Ins. Co., 322 U.S. 408, 64 S.Ct. 1075, where misconduct of a receiver incompatible with his position was held sufficient to require that he be denied all fees and compensation as receiver. The court also held (page 414 of 322 U.S., page 1079 of 64 S.Ct.) that any profits resulting from a breach of high standards demanded of a trustee or other similar fiduciary "would have to be disgorged and applied to the estate." In Woods v. City Nat. Bank Co., 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820, the court held that "reasonable compensa-

Since neither of the judges who concurred in the decision of the court is of the opinion that the petition for rehearing should be granted, it is hereby denied.

WALLER, Circuit Judge, dissents.

tion for services rendered" necessarily implied loyal and disinterested services in the interest of those for whom the claimant purported to act, and that where a claimant "was serving more than one master or was subject to conflicting interests, he should be denied compensation." Finally, the court said (page 269 of 312 U. S., page 497 of 61 S.Ct., 85 L.Ed. 820): "Only strict adherence to these equita-

ble principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.' " It is not only an evil result, but the tendency to evil, that is material, "because tending to produce the recognized abuses which follow fraud and disloyalty by agents and trustees." Chief Justice Taft in Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 149, 73 L.Ed. 243.