**Sidney J. GEFEN and Lois Gefen, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 24440.**

United States Court of Appeals
Fifth Circuit.

Aug. 29, 1968.

Rehearing Denied Sept. 24, 1968.

Joseph M. Glickstein, Jr., Jacksonville, Fla., for appellants.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli, Loring W. Post, Robert I. Waxman, Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Tampa, Fla., William N. Hamilton, Jr., Asst. U. S. Atty., Jacksonville, Fla., for appellee.

Before BELL, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

The government seeks affirmance of a judgment against Sidney and Lois Gefen for Sidney Gefen's [hereinafter Gefen] willful failure on behalf of Georgia Shipbuilding Corporation [hereinafter Georgia Ship] to pay over certain withholding and F.I.C.A. tax liabilities. 26 U.S.C. §§ 6672 and 6671(b).[1] The District Court,[2] as part of its judgment, foreclosed the federal tax lien on any property of the taxpayers, specifically on the cash surrender value of a life insurance policy on Gefen's life with Lois Gefen as beneficiary. 26 U.S.C. §§ 6321 and 6322.[3] Gefen seeks reversal on two grounds. First, he asserts that the District Court's refusal to grant a jury trial transgressed his rights under the Seventh Amendment to the Constitution and under Rule 38 of the Federal Rules of Civil Procedure.[4] Second, he contends that the Court erred in finding him to have been a responsible corporate officer with a duty to pay such taxes and in finding that he willfully failed to pay the taxes. We reject both points on appeal and affirm.

## I. *Jury Trial in Tax Cases*

In Damsky v. Zavatt, 2 Cir. 1961, 289 F.2d 46, the Second Circuit considered the same procedural issues that we face here. In that case Bernard and Olga Damsky, husband and wife, had been assessed for non-payment of income taxes during a period of several years. In addition, tax liens had been filed on property owned by Olga for all except three of the years in question. Following the Damsky's timely demand for a jury trial and the government's motion to strike such demand, the Honorable Joseph C. Zavatt, District Judge, issued a written opinion and order granting the government's motion in

---

1. § 6672. Failure to collect and pay over tax, or attempt to evade or defeat tax
    Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable.
    '§ 6671. Rules for application of assessable penalties
    *  *  *  *  *
    (b) Person defined.—The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

2. Jurisdiction of the District Court is authorized by 28 U.S.C. §§ 1340, 1345 and 26 U.S.C. §§ 7402, 7403.

3. § 6321. Lien for taxes
    If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
    § 6322. Period of lien
    Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.

4. Amendment VII—Civil Trials
    In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law.
    Rule 38. Jury Trial of Right
    (a) Right Preserved. The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.
    *  *  *  *  *

full. United States v. Damsky, E.D. N.Y. 1960, 187 F.Supp. 404. The Damskys sought a writ of mandamus directing Judge Zavatt to vacate that order. In an opinion laden with thorough and exegetic historical credentials, Judge Friendly granted the writ with respect to these claims asserted solely against Bernard Damsky (only the years for which no tax liens had been filed). Judge Clark dissented as to this part of the opinion but concurred in the remainder of the majority opinion, in which the Court refused to issue the writ with respect to the claims arising from foreclosure of the tax lien on Olga's property.

■ Our concern at bar is with that part of the majority opinion in *Damsky* which denied the taxpayers' right to a jury trial in the years of foreclosure. We quote Judge Friendly's foundational analysis in full:

"At the opposite extreme from the claims against Bernard just considered lies so much of the complaint as seeks to establish the validity of the tax liens against Ollie's real properties and the sale of the properties to satisfy them.

"Mr. Justice Story pointed out in Parsons v. Bedford, 1830, [28 U.S. 433] 3 Pet. 433, 446–447, 7 L.Ed. 732, that in view of the use of the phrase 'all cases in law and equity' in Article III of the Constitution and the historic practice 'that courts of equity use the trial by jury only in extraordinary cases, to inform the conscience of the court,' the natural conclusion from the reference to suits at common law in the Seventh Amendment is 'that this distinction was present to the minds of the framers of the amendment' and that they did not intend the amendment to apply to proceedings 'where equitable rights alone were recognized, and equitable remedies were administered.'

"Foreclosure of the mortgagor's equity of redemption was an established head of equity jurisdiction well before 1791, How v. Vigures, 1 Rep. Ch. 32, 21 E.R. 499 (1623) ; Emanuel College v. Evans, 1 Rep.Ch. 18, 21 E.R. 494 (1625) ; and this necessarily embraced the determination of the amount and validity of the mortgage debt. 1 Glenn, Mortgages (1943), 399–400. The more modern method of foreclosure through decree of sale, provided for United States tax liens by I.R.C. § 7403, is sufficiently akin to the historic equity practice to preclude successful contention for a right to jury trial with respect to the ascertainment of the amount of the tax lien as against taxpayer's property and enforcement of the lien by sale. See 5 Moore, Federal Practice (2d ed. 1951), pp. 81, 109. United States v. Malakie, D.C.E.D.N.Y. 1960, 188 F.Supp. 592." 289 F.2d at 52–53.

In an equally scholarly analysis Judge Friendly upheld the right of the District Court to render a judgment against Olga personally for any deficiency which might have remained unsatisfied after judicial sale of the mortgaged premises. 289 F.2d at 54–55.

The District Court in the case at bar followed other district courts in denying a jury trial primarily on the basis of the *Damsky* decision. See United States v. Warren, W.D.N.C.1964, 235 F.Supp. 638 (which embellishes *Damsky* by interpreting the language of Section 7403(c) as a rejection of jury trials in tax foreclosures) ; United States v. Rentz, N.D. Iowa 1962, 213 F.Supp. 521. In accord, United States v. Malakie, E.D.N.Y.1960, 188 F.Supp. 592. See also Note, 46 Minn.L.Rev. 643 (1962) (an extensive and favorable review of the *Damsky* decision) ; Note, 110 U.Pa.L.Rev. 133 (1961) (a shorter review, also favorable) ; 5 Moore, Federal Practice ¶ 38.31 [1] at 34–35, and ¶ 38.38 [4] at 45, (1967 Supp.) (which briefly summarizes the *Damsky* decision without evaluative comment) ; 2B Barron and Holtzoff, Federal Practice and Procedure § 872 at 17, (Wright ed., 1967 Supp.) (a similar summary of the *Damsky* decision) ; James, Civil Procedure § 8.11

at 378 n. 4 (1965, also published in 1963 at 72 Yale L.J. 655, 691 n. 203) (which quotes Judge Clark's dissent objecting to the partial granting of a jury trial in *Damsky* and refers to it as "a wise and temperate judicial appraisal of the problem"). We likewise agree that the historicity of foreclosure as a ward of equity is documented accurately in Judge Friendly's scholarly opinion. And although the classification of pre-1791 standards does not capture our unqualified enthusiasm, we follow *Damsky* until the Supreme Court frees us from its validated historical bondage.[5]

## II. *Gefen's Responsibility to Pay Taxes for Georgia Ship*

The following facts are undisputed. Gefen was a partner holding a 50% interest in MacDonnell Boats when on August 18, 1952, a contract was executed with the Navy Department's Bureau of Ships for MacDonnell to build five motor gun boats. Thereafter, MacDonnell Boats was incorporated as Georgia Shipbuilding Corporation, with Gefen and his wife owning 50% of the capital stock. Gefen served as president of Georgia Ship and a member of its Board of Directors from the date of its incorporation until April 30, 1955, when he resigned and sold his entire interest in the corporation. During his tenure as president Gefen's signature was required on all checks drawn on the corporation's bank account. From July 1, 1954, until April 30, 1955, the period of time involved here, Georgia Ship accrued on its books and carried as a liability an accrued salary payable to Gefen of $2,000 per month. His accrual salary rate was the highest of any employee or officer of Georgia Ship, but he never received actual payment of any salary.

As early as July, 1954, Gefen participated in negotiations with the Navy to

---

5. The absolute reliance in *Damsky* on historical precedent has clearly produced a non-functional result in that, as has been pointed out by a student commentator, "it denies the taxpayer who owns property a right to a jury trial, while the taxpayer who has no property is granted this right." Note, 46 Minn.L.Rev. 643, 651 (1962). Nevertheless, although we may wish to ignore certain outdated concepts of yore, our recourse to modern legal principles is restricted severely by the plain words of the Seventh Amendment. See note 4, supra. See also 5 Moore, supra, ¶ 38.11 [7]; 2B Barron and Holtzoff, supra, § 872; James, supra, §§ 8.1-8.-11 (especially Professor James' critical analysis of competing tests in his conclusion, pp. 377-81 of his book, pp. 690-93 of the law review article).

In recent years the Supreme Court has indicated a willingness to abandon certain historical concepts in correlating a party's constitutional right to a jury with modern forms of pleading. Beacon Theatres, Inc. v. Westover, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L,Ed.2d 988; Dairy Queen, Inc. v. Wood, 1962, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44; Meeker v. Ambassador Oil Corp., 1963, 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261, reversing per curiam the judgment of the Court of Appeals for the Tenth Circuit, 308 F.2d 875 (1962). See also Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 5 Cir., 1961, 294 F.2d 486 (quoted favorably in the Dairy Queen decision, supra, 369 U.S. at 473 n. 8, 82 S.Ct. 894). Cf. Fitzgerald v. United States Lines Co., 1963, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720. These decisions perhaps augur a more functional and less historical interpretation of the Seventh Amendment; however, at present we agree with Professor Wright's comments when considering *Beacon Theatres*, supra: "Perhaps the most that can be said by way of explanation * * * until further light is shed by the Supreme Court, is that it lends impetus toward finding a right to trial by jury in doubtful cases." 2B Barron and Holtzoff, supra, at p. 29. Moreover, our Circuit has expressly refused to constrict equity jurisdiction further than was done by the Supreme Court. Swofford v. B & W, Inc., 5 Cir. 1964, 336 F.2d 406, 414, cert. den., 1965, 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557, quoted and followed in Local No. 92, etc., v. Norris, 5 Cir. 1967, 383 F.2d 735, 741. Compare International Brotherhood of Boilermakers, etc. v. Braswell, 5 Cir. 1968, 388 F.2d 193, 197-98, cert. den., 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854. Especially in light of the above authority, we read no commanding language in the Supreme Court opinions to date which would cause us to deviate from the teachings of *Damsky*.

rescue Georgia Ship from financial difficulties. On September 23, 1954, these negotiations resulted in an amendment to the 1952 contract under which the Navy would make an advance payment of $172,000 to the corporation. The following items from the corporation's balance sheets clearly show the immediate outflow of funds to creditors after receipt of the $172,000 payment:

|  | 31 Aug. 1954 | 30 Sept. 1954 |
|---|---|---|
| Current Assets—Cash | $ 4,538.91 | $45,678.54 |
| Current Liabilities— |  |  |
| Accounts Payable | 130,173.49 | 26,451.47 |
| Accrued Payroll Taxes | 21,701.59 | 20,919.53 |

On October 30, 1954, Gefen, as president of Georgia Ship, signed Form 941, Employer's Quarterly Federal Tax Return, in which he declared liability for the following tax payments: (1) $10,508.54, representing federal income taxes of the employees which the corporation had withheld from their wages and salaries during the third quarter of 1954; and (2) $5,052.98, representing the corporation's liability under the Federal Insurance Contributions Act (F.I.C.A.). This return, however was received by the office of the District Director of Internal Revenue without payment.

On November 9, 1954, the Navy again amended its contract with Georgia Ship and agreed to loan the company an additional sum of $50,000. Unlike the advancement of $172,000 in September, the loan agreement expressly provided for the use of the funds, stating in part:

"These funds shall not be used to pay any part of the Contractor's delinquent withholding taxes without prior written approval of the Administering Office."

The loan agreement also required a Navy Special Account, and on November 10, 1954, such account was opened with Georgia Ship's bank in Jacksonville, with Gefen as the sole company officer authorized to make withdrawals on that account. On December 10, 1954, and on January 14, 1955, the company used funds presumably from that account to pay $17,431.99 and $8,971.66 for labor, material, and other expenses.

On January 24, 1955, Gefen sent a "Request for Amendment Without Consideration" to the Navy seeking further advance payments. The request read in part:

"The contractor is being pressed for payment by the local Director of Internal Revenue and the Georgia Employment Security Agency for withholding taxes, social security taxes, * * * in the amount of $43,508.07. Of this amount $18,728.15 represents taxes from the third quarter, 1954, the balance is for the fourth quarter, 1954."

Seven days later, on January 31, 1955, Gefen signed Form 941 for the fourth quarter of 1954, declaring liability for that quarter in the sum of $19,844.62. The return was again received in the office of the District Director without payment.

Finally, on April 30, 1955, Gefen signed Form 941 for the first quarter of 1955, declaring liability for that quarter in the sum of $12,165.02. The return was received in the office of the District Director without payment. It was upon the basis of these three quarters that the government sought and the District Court granted the 100% penalty tax against Gefen.

■ Gefen's defense to the penalty tax posits two factual challenges to the District Court's findings. First, he asserts his initial ignorance of the above failure to pay taxes. Second, he claims that by the time he learned of the deficiencies, the company was financially

unable to pay the taxes. In certain areas these two defenses are mutually inconsistent. For example, Gefen claims that on October 30, 1954, he signed a check for payment of taxes at the same time that he signed Form 941. According to Gefen, he was totally unaware that the tax had not been paid. However, at the conclusion of the last two periods in question, at which times Gefen admits knowledge of the tax deficiency but contends that the company was unable to pay (indeed he paints a picture of substantial but frustrated efforts on his part to raise money for paying the taxes), he also insists that he signed checks for payment of taxes at the same time that he signed Form 941.[6]

Gefen, in his reconstructed image of his position as president of Georgia Ship, seeks the shelter of irresponsibility and naivete; however, the facts do not provide the foundation for such shelter. The evidence is without challenge that there were economic distress signals all around Gefen. Gefen admittedly participated in conferences with the Navy as early as July, 1954, concerning Georgia Ship's need for advance payments. He admittedly requested additional funds on January 24, 1955, and expressly stated as a justfication the company's failure to pay withholding taxes (which failure had also been mentioned in the November 9 amendment to the Navy contract). Moreover, he admittedly participated in conferences with Jack Durant from the Jacksonville office of the I. R. S. concerning the failure to pay such taxes. Durant testified that their first conference occurred in the latter part of November, 1954, and although Gefen recalled the meetings as beginning a couple of months later, his memory was extremely indefinite in this regard.

In spite of the above indicia of financial awareness and responsibility, Gefen asserts that he was no more than a passive figurehead who never looked at a company balance sheet (which kept a monthly record of "Accounts Payable-Accrued Payroll Tax"), who concentrated mainly on his other business interests, and who used his spacious office at Georgia Ship merely to read his personal mail. He claims that the only officer who exercised fiscal responsibility in the company was the Vice President and Treasurer, R. F. Cottrell. Cottrell did indeed seem to be the most active day-to-day executive in the company, but he owned no stock in Georgia Ship, he was not a member of the Board of Directors, and he could not sign checks on corporate accounts. Furthermore, Durant testified that Cottrell did not participate in conferences concerning Georgia Ship's tax liability until the latter part of April, 1955 (shortly preceding Gefen's termination of his relationship with the company). Cottrell may have been the cicerone for Georgia Ship, but he was certainly not its master.

The District Court's findings of fact expressly provided that Gefen was the chief executive officer of Georgia Ship

---

6. During cross examination at trial Gefen testified as follows:

"Q. In the ordinary routine you would send it [a check for taxes] up to MacDonnell [the co-owner of Georgia Ship and the sole co-signer of company checks]?

A. That's right.

Q, And then it would be mailed in to the Internal Revenue Service?

A. Correct.

Q. Is that true for this return of October 30, 1954? That is the one I just showed you.

A. Apparently so.

Q. I see. And this return of January 31, 1955. Is that so?

A. Yes, sir. Everytime I signed one I signed a check.

Q. I see. And you gave it to the bookkeeper?

A. That's right.

Q. And it was sent up for Mr. MacDonnell's signature. It came back.

A. That's right.

Q. And was mailed in to the Internal Revenue Service?

A. I thought so.

Q. You did?

A. Yes.

Q. Okay. And this one is the one for April 30, 1955?

A. Yes, sir."

until April 30, 1955, and that he was a person required to collect, truthfully account for, and pay over the tax liabilities here involved. We conclude that Gefen's status in the company hierarchy and his authority, both apparent ·and actual, in relation to the specific tax liability in question leave little doubt as to the validity of those findings. See Datlof v. United States, E.D.Pa.1966, 252 F.Supp. 11, 32–33, which lists criteria that courts have found useful in determining whether a taxpayer was a person required to pay over such taxes. See also Kelly v. Lethert, 8 Cir. 1966, 362 F.2d 629, 634, where the Court concluded:

> "The appellant, though a young man of 26, was a principal officer of the corporation from which the unpaid withholding taxes are due, and he was admittedly authorized to sign checks in the corporate name. His defense that he spent most of his time in selling, rather than in executive and administrative operations of J. D. Davis Company, causes a sympathetic response from the Court but is factually no defense for failing to fulfill the duties of a corporate office of vice-president and treasurer authorized to make disbursements of corporate funds in discharge of corporate liabilities."

■ There is perhaps a bit more room for doubt concerning the District Court's conclusion that Gefen *willfully* failed to collect or truthfully account for and pay over the taxes in question.[7] In this regard the case at bar is similar to United States v. Leuschner, 9 Cir. 1964, 336 F.2d 246, wherein that Court affirmed a District Court's refusal to penalize the failure of Leuschner, a director and general manager of Yosemite Creek Company, for the company's failure to pay over withholding taxes. At trial Leuschner had testified that he had left signed checks and returns with the company comptroller, and the District Court had accepted such testimony as conclusive. The Ninth Circuit affirmed, stating both that, "the question is one of fact," and that the evidence would support a finding that, "Leuschner was negligent, which is not wilfulness." 336 F.2d at 248.

The taxpayer at bar strives to attain the benefits of the *Leuschner* division, but for two important reasons such benefits do not lie within his grasp. First, the Ninth Circuit was careful to note that the controlling issues were those of fact and that the thrust of its opinion was determined in advance by the findings of the District Court. The findings in the case at bar, unlike those in *Leuschner,* go against the taxpayer. Second, the Ninth Circuit expressly held that any knowledge of tax deficiencies would automatically remove from the taxpayer his veil of innocence. Thus, as to the second part of the assessment against Leuschner, that covering his failure to pay over the taxes after Yosemite Creek Company had closed down its business and had reformed under the name of Kadota Creek Company, the Court reversed the District Court's findings and assessed the penalty. We quote that section of the opinion in full:

> "We think, however, that in the case of taxes withheld by Kadota the result must be different. When Kadota took over the business, Leuschner knew that Anders, on whom he relied, had failed to see that such taxes were paid and had preferred other creditors. Yet he did absolutely nothing to see that this did not happen again. He was Anders' superior in the company. He had a duty to see that the taxes were paid. He knew that the withheld moneys were a trust fund for the United States, and were to be paid to it. He

---

7. We pause to restate the established principle that the term "willful" for purposes of Section 6672 of the Code does not require a finding of intent to defraud or to deprive the United States of taxes. It requires only that the choice to pay funds to other creditors instead of the government be made voluntarily, consciously, intentionally, and without reasonable cause. Frazier v. United States, 5 Cir. 1962, 304 F.2d 528; Dillard v. Patterson, 5 Cir. 1963, 326 F.2d 302; Cash v. Campbell, 5 Cir. 1965, 346 F.2d 670; Hewitt v. United States, 5 Cir. 1967, 377 F.2d 921.

knew that Anders, to whom he looked to carry out that duty, had not done it. He could no longer, in good faith, look to Anders to do his duty for him. His complete failure to do anything to see that Anders, or he himself, performed that duty, is, we think, as a matter of law, a 'voluntary, conscious and intentional' failure. The court's contrary finding is clearly erroneous." 336 F. 2d at 248.

The District Court in the case at bar specifically found that in September, 1954, Gefen had participated in the decision to use the advance payment of $172,-000 to pay other creditors. (Gefen's testimony is contrary with this finding, but MacDonnell's testimony is consistent with it.) We accept this finding as correct and, combining it with the other facts mentioned above, conclude that the District Court was warranted in assessing the tax penalty against Gefen. It was certainly within the Court's bounds of factfinding to have rejected Gefen's protestations that, as to tax liability, he was merely an impotent and non-cognitive cog in Georgia Ship. We need not condone a game of blind mans buff in avoidance of a statutory duty.

Affirmed.