FEDERAL DEPOSIT INSURANCE COR-
PORATION, as receiver of the Farmers
Bank of Petersburg, Petersburg, Ken-
tucky, Plaintiff,

v.

FRANCHISE FINANCE AND MANAGE-
MENT COMPANY, INC., a Delaware
corporation, et al., Defendants.

Civ. No. 72–88.

United States District Court,
S. D. Florida,
Miami Division.

Feb. 9, 1973.

J. Frost Walker, of Blackwell, Walker
& Gray, Miami, Fla., for plaintiff.

Sidney Soltz, Miami, Fla., for Alvin
Klupt, defendant.

ROETTGER, District Judge.

This seemed less like a trial than
watching a "B" movie on the late show.
The setting for this bizzare transaction
is an unlikely one: Petersburg, Kentuc-
ky, a town of 430 people, approximately
40 miles down river from Cincinnati.
The Farmers Bank of Petersburg is
quartered in a simple one-story building
which appears to be less than 15 feet in
width. The liquidator testified that it
is the smallest bank, both in physical
size and in assets, seen by him during

his several years experience as a bank examiner and liquidator for the plaintiff.

The bank was established shortly before 1908 and at the pertinent times had capital of $25,000 and a surplus of $30,000. As of the end of June, 1969, the bank's total assets were $579,000. The minutes of the meeting of the board of directors in July, 1969 indicate its attention was directed to such matters as an increase in an employee's salary of $5 per week and car allowances of $25 per month.

Kentucky law limits a bank's loans to a percentage of its capital and surplus which in this case placed a ceiling of $11,000 on unsecured loans and $16,500 on secured loans.

Meanwhile, Franchise Finance and Management, a franchisor corporation with its offices in St. Petersburg, Florida, was in serious financial straits. It owed over $300,000 to more than 100 creditors and had no money. It owned no land, but had approximately six fast-food restaurants open for business near St. Petersburg. It was operating on a cash-only basis and would not deposit funds in any checking accounts for fear of attachment.

Miami defendant Alvin Klupt, a law school graduate at age twenty and disbarred as a lawyer in Maryland at twenty-nine, is presently appealing a conviction in the United States District Court for the District of Vermont for a conspiracy in 1970 to conceal assets from a bankrupt estate. He acquired control of the defendant Franchise Finance by paying less than fifteen hundred dollars to the original shareholders for approximately two-thirds of the shares and for compromising the claims of creditors. It must be noted that the latter efforts were hardly successful because numerous final judgments were obtained against Franchise Finance.

Among Klupt's enterprises was a collection system and he had a franchise-salesman in Kentucky named John Osborne. Osborne had met one Truitt DeMoisey, a lawyer in Kentucky who was counsel for the Farmers Bank of Petersburg as well as one of its directors. Osborne introduced Klupt and DeMoisey in November of 1969.

Klupt took over Franchise Finance in January, 1970 and installed Osborne, his salesman, from the small hamlet of Russell Springs, Kentucky, as president of the St. Petersburg corporation. Osborne's father, a career federal civil servant residing in Kentucky, was named vice president of Franchise Finance. The pitch was made to DeMoisey—and apparently to some of the directors of Farmers Bank—that in return for loans Franchise Finance would arrange for deposits of large amounts of certificates of deposit. In fact, about $600,000 of such certificates were deposited in Farmers Bank during the winter and spring of 1970. These two officers signed a corporate note for $40,000 to Farmers Bank on February 13, 1970, and the proceeds were turned over to Franchise Finance. Since $30,000 of the loan on this note was from a participating bank the loan used up $10,000 of Farmers Bank $11,000 limit for unsecured loans.

The testimony as to the events at Franchise Finance during the early months of 1970 reveal a course of conduct totally manipulated by Klupt. He dispatched defendant Michael Shipley to St. Petersburg supposedly to compromise the claims of creditors. Shipley, however, dealt with only one creditor, and that rather unsuccessfully as the creditor subsequently obtained a judgment against Franchise Finance. The testimony corroborates the observation of Fentress, the comptroller of Franchise Finance, that after January 28, 1970, Klupt acted like the owner of Franchise Finance. Klupt vacillated between various corporate alternatives to take control of Franchise Finance and to obtain the loan from Farmers Bank.

Defendant's witnesses then reveal a classic series of events. Franchise Finance had set a closing date of March 20, 1970, with its creditors. On Thurs-

**1018**

day, March 19th, Klupt chartered a plane in Florida and flew to Cincinnati to receive an additional $200,000 pursuant to a note executed by the Osbornes for Franchise Finance in the office of DeMoisey. After banking hours that afternoon, DeMoisey demanded that the Bank's cashier prepare and sign a cashier's check for $200,000. He assured her that everything had been approved and it would be quite all right. DeMoisey then delivered the check for $200,000 to Klupt and, according to Klupt, assured him an additional $360,000 would be forthcoming and that he should deposit Franchise Finance checks in the amounts of $100,000, $100,000, $100,000 and $60,000 on alternate banking days beginning the following Monday. Klupt returned to Florida that night on the chartered plane and turned over the cashier's check and the four executed checks to his lawyer.[1] The cashier's check was deposited in the trust account of Klupt's lawyer and the four checks totalling $360,000 were made payable to his lawyer. Klupt's lawyer deposited the cashier's check on the 20th, and evidently becoming impatient, also deposited the first $100,000 check that same day rather than waiting until the following Monday.

The testimony was uncontradicted that there was no authority whatsoever for the disbursal of the $200,000 by the Farmers Bank. The monthly meeting of the board of directors was held on March 7th and no mention is made in the minutes of any such loan. On Monday, March 23rd, the bank's cashier, plainly upset over what had happened, tried to stop payment on the cashier's check. Farmers Bank evidently had no executive officer present at the bank during banking hours. A special meeting of the directors was held as quickly as possible on March 26th with all but one of the directors present. The min-

utes reveal that the meeting was called to discuss the fact that a loan had been made to Franchise Finance and a check had been drawn in the amount of $200,000 without the approval of the directors and in violation of Kentucky statutes and the loan policy of the bank. The directors were unanimous in voicing their disapproval of this loan. The strong feeling of the directors is underlined by the fact that each of the directors present, with the exception of DeMoisey, signed the minutes for this particular meeting, a heretofore nonexistent practice. In addition, the minutes of this meeting reveal an additional uncharacteristic, and perhaps improvident, act on the part of the directors: this was the only meeting not opened and closed with prayer.

Unfortunately, the complete circumstances surrounding the issuance of the $200,000 check were not presented to the Court because DeMoisey vanished shortly after the bank's collapse. In addition, counsel did not bother to depose Ms. Toole, the cashier; anyone who grew up in a town the size of Petersburg would have counted on her to provide the most accurate and complete testimony about what happened.

There was no participation with any other bank in the $200,000 loan and the purported $360,000 loan was never consummated. No evidence of the commitment for the additional $360,000 has been introduced other than a letter from DeMoisey to Franchise Finance dated April 2, 1970. No payment was made by Franchise Finance on the notes.

As a result of the $200,000 loan the bank was closed on June 25, 1970 by the Commissioner of Banking, Commonwealth of Kentucky, because the bank was hopelessly insolvent. The plaintiff was appointed receiver of the bank and in this capacity filed this diversity suit against Franchise Finance and Klupt

[1]. Klupt's lawyer wrote Franchise Finance in December, 1969 and advised them that he had been retained by DeMoisey for the Farmers Bank of Petersburg in connection with the "acquisition of Franchise Finance and Management Co., Inc.". It should be observed that this attorney testified twice during the trial and never once gave an unequivocal answer other than to deny the truth of this letter admittedly signed by him on his letterhead.

for the recovery of $240,000 plus interest and against Shipley and the corporations formed by him and Klupt for the proceeds they received from the $200,000 loan. No evidence was introduced as to Bernice Klupt and a judgment of dismissal was entered in her favor at the close of plaintiff's case.

Franchise Finance counterclaimed alleging $492,872 in damages as the result of the failure of the bank to go through with the additional $360,000 loan. Defendants, candidly admitting at the trial that the counterclaim presented a novel theory of recovery, have failed to persuade the Court that its counterclaim has any merit.

*Waiver of Equitable Relief*

■ Prior to trial defendants filed a Motion to strike plaintiff's demand for a jury trial, contending that the Complaint sought equitable relief. Subsequently, plaintiff filed its "Waiver of Right to Equitable Relief" as further support for its contention that the Complaint stated legal claims. Although plaintiff withdrew its demand for a jury trial after the pretrial conference, plaintiff renewed its waiver on the first day of trial. Before reaching the question of liability, the Court must determine whether plaintiff has waived its right to relief.

The determination of plaintiff's right to recover depends upon whether the Complaint states a claim which is legal or equitable in nature. If legal, plaintiff's waiver is of no effect but if the claims are equitable, relief is prohibited.

■ First, it must be noted that while the Rules of Civil Procedure have abolished the distinction as to forms between actions at law and suits in equity, the distinction in substance between the two is still viable.[2] *See, e. g.*, Commercial National Bank in Shreveport v. Parsons, 144 F.2d 231 (5th Cir. 1944), reh. denied, 145 F.2d 191 (1944), cert. denied, 323 U.S. 796, 65 S.Ct. 440, 89 L. Ed. 635 (1945), holding that an action against a trustee for an accounting falls within the equity jurisdiction of the federal courts. *See also* Gefen v. United States, 400 F.2d 476 (5th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 990, 22 L.Ed.2d 123 (1969), citing Damsky v. Zavatt, 289 F.2d 46 (2nd Cir. 1961).

■ Since the question of right to jury is not before the court, the determination of whether plaintiff has stated an action at law or a suit in equity is made by reading the complaint as a whole. *See* Beacon Theatres v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

Count I is a suit on a promissory note, clearly an action at law, and summary judgment was entered in plaintiff's favor against Franchise Finance prior to trial.

■ Count II alleges that defendant Klupt, as Chairman of the Board of Franchise Finance as well as its majority stockholder, manipulated Franchise Finance so as to induce the board to seek the loan from plaintiff. Count II further alleges that Klupt diverted the assets of Franchise Finance to his own use. Because Franchise Finance was the alter ego of Klupt, plaintiff's second count seeks to hold Klupt personally liable for the amount of the note in Count I. It is clear that Count II, seeking relief against Klupt personally, may be characterized as a legal claim. Insofar

2. The distinction between legal and equitable rights must be preserved under Art. 3 § 2, cl. 1 of the Constitution of the United States. Phillips Petro. Co. v. Johnson, 155 F.2d 185 (5th Cir. 1946), cert. denied, 329 U.S. 730, 67 S.Ct. 87, 91 L.Ed. 632 (1946).
For the same proposition see Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741 (1949) ; Bradley v. United States, 214 F.2d 5 (5th Cir. 1954) ; Humble Refining Co. v. Sun Oil Co., 191 F.2d 705 (5th Cir. 1951), cert. denied, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687; Sun Oil Co. v. Burford, 130 F.2d 10 (5th Cir. 1942), rev'd on other grounds, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), reh. denied 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943).

as it seeks a money judgment against Klupt, the count sounds at law. Dairy Queen v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1964). Further, a suit "to pierce the corporate veil" is a legal claim. *See, e. g.*, House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F.2d 64 (5th Cir. 1972) (by implication: upholding denial of motion for directed verdict and sending case to jury on theory of alter ego to pierce corporate veil).

Counts III and IV allege that Klupt disbursed the proceeds of the loan from Farmers Bank to certain defendants, including defendant Shipley. As a consequence, plaintiff seeks an "accounting" and to have these defendants declared "constructive trustees" to avoid their "unjust enrichment" of money which rightfully belongs to plaintiff. The substantive claims and remedies sought in Counts III and IV are traditionally equitable in nature and plaintiff has waived its right to such relief.

*Piercing the corporate veil*

■ "If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C.E.D.Wis.1905) (Sanborn, J.). Florida courts adhere to this often quoted generalization and are reluctant to pierce the corporate veil unless it is necessary to prevent fraud or injustice. *See, e. g.*, Roberts Fish Farm v. Spencer, 153 So.2d 718, 721 (Fla.1968). While this Court is reluctant to do so, it is apparent that the evidence before the Court requires it to look behind the corporate entity and hold Klupt personally liable.

The fact that Klupt owned about 67 per cent of the stock of Franchise Finance in no way means that he should be liable for its debts. Neither is the Court unaware of the fact that, as majority stockholder, some influence by him in corporate matters is to be expected. But here the corporation was Klupt's instrumentality or alter ego and the control exercised by him was used in such a manner as to defraud the plaintiff.

The evidence showed that Klupt allowed his funds to be comingled with those of the corporation. Certain of the loan proceeds by the Farmers Bank to Franchise Finance were wired to the personal account of Klupt and his wife. This comingling of funds is one of the prime factors used by courts in determining whether to disregard the corporate entity privilege. Klupt "must have known what was going on . . ." and he "participated in a fraud upon creditors . . . ." Codomo v. Emanuel, 91 So.2d 653, 655 (Fla.1956).

The evidence also showed that the proceeds of the $200,000 loan from the bank had been transferred from Franchise Finance's account into the trust account of Klupt's lawyer. One hundred thousand dollars was then disbursed from the trust account to Shipley who, in turn and through the guise of one of his own corporations, disbursed $50,000 to Klupt and his wife. These transfers from the bank to Franchise Finance and, ultimately, into the hands of Klupt reek of fraudulent conduct. If anyone was entitled to the illegal disbursement, it was Franchise Finance. Yet, the evidence unmistakably traces this property of the corporation into the hands of Klupt. Klupt, therefore, was personally liable for, at the minimum, the corporate property converted and consumed by him for his personal use. Advertects, Inc. v. Sawyer Industries, 84 So.2d 21 (Fla. 1955).

Wherefore, the Court holds plaintiff is entitled to recover from Alvin Klupt the entire proceeds of the $240,000 loans made by the Farmers Bank to Franchise Finance. Judgment to be entered accordingly.